UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                                    Case No.   6:15-cr-176-Orl-37KRS

JOSHUA ADAM TATRO

### STIPULATION OF THE PARTIES FOR PURPOSES OF A BENCH TRIAL

The United States of America and the defendant, JOSHUA ADAM TATRO, by him

and his undersigned counsel, hereby enter into this Stipulation of the Parties.   The

United States of America and the defendant, JOSHUA ADAM TATRO, (collectively

referred to herein as the "parties") jointly stipulate and agree that the following facts have

been proven beyond a reasonable doubt at the trial in this case:

1.      On or about January 24, 2015, Google, Inc. ("Google") notified the National

Center for Missing and Exploited Children ("NCMEC") about a Google account that had

uploaded 14 images of child pornography onto Google+ Photos, an online drive.

NCMEC prepared a CyberTipline Report detailing the tip provided by Google.   The child

pornography images were uploaded by an individual accessing Internet Protocol ("IP")

address 142.197.64.38, on January 23, 2015, from 14:15 hours through 14:22 hours UTC

time.   The email address associated with the account that uploaded the images was

"josh17hudson@gmail.com" ("TATRO's Gmail account") and the mobile phone number

provided for the account was 321-458-5324 ("TATRO's phone number").   Google also

attached the images in the tip they submitted to NCMEC.

2.       NCMEC processed the information provided by Google and generated additional information, including a "Geo-Lookup" of the IP address that the Google user used to upload the images.  This "lookup" was based on publicly available online searches and it confirmed that the IP address was registered to Bright House Networks and assigned to Merritt Island, Florida.   NCMEC staff also performed searches of TATRO's Gmail account and TATRO's phone number on publicly-available, open-source websites, which confirmed that the phone number was associated with TATRO's girlfriend.   TATRO's girlfriend has the last name "Postmus."   As set forth below, TATRO lived with his girlfriend, their three year old child ("the minor victim"), and his girlfriend's parents, at a house on Merritt Island ("TATRO's residence").   TATRO's phone number was also listed on TATRO's Facebook page.   Information that was publicly available on TATRO's Facebook page confirmed that TATRO had access to a toddler age child, the minor victim.   NCMEC also identified TATRO's pedigree information, including the address of TATRO's residence on Merritt Island, in Brevard County, Florida, in the Middle District of Florida.   All of the aforementioned information was submitted to the State Internet Crimes Against Children ("ICAC") Task Force in Gainesville, Florida.

3.       On or about February 26, 2015, the ICAC Task Force referred the aforementioned information from the NCMEC CyberTipline Report to the BCSO.   Task Force Agent ("TFA") Michael Spadafora was assigned to the tip and confirmed that the images that were enclosed in the report constituted child pornography.   Some of these child pornography images depicted children similar in age to that of the minor victim. After viewing the images, TFA Spadafora identified TATRO's residence using law enforcement databases and subpoenaed records provided by Bright House Networks

2

and MetroPCS for the aforementioned IP address and TATRO's phone number.

4.      On or about March 5, 2015, TFA Spadafora and BCSO Agent Vincent Ziccardi conducted physical surveillance at TATRO's residence and confirmed that the only unsecure wireless signal was associated with a neighbor who lived next door to the residence.   Thus, the agents believed that the aforementioned IP address that was used to upload the child pornography images to Google+ Photos was not an unsecure IP address.

5.      On or about March 17, 2015, TFA Spadafora conducted physical surveillance again at TATRO's residence.   The agents observed TATRO and two women arrive at the residence in a vehicle.   The occupants of the vehicle exited and TFA Spadafora recognized TATRO from a photograph of TATRO obtained from the Florida Driver's and Vehicle Information Database ("DAVID").   TATRO exited the vehicle with a three year old child, who was later confirmed to be the minor victim.

6.      Later on March 17, 2015, TFA Spadafora and BCSO agents executed a state court issued search warrant at TATRO's residence.   The warrant authorized the agents to search the residence and electronic devices for evidence of child pornography offenses.   The warrant also permitted the agents to conduct "off-site" forensic examinations of electronic devices by a computer forensic analyst.   Before the warrant was executed, TFA Spadafora and Agent Troy Deavers knocked on the door to the residence and observed the minor victim inside the house.   The agents asked for TATRO who eventually approached the agents.   The agents then asked to speak with TATRO in private and the agents conducted a non-custodial interview of him in the garage, inside the residence.   During this interview, TATRO made the following

3

admissions, among other statements:

    a.    Regarding TATRO's Gmail account (which used a name that included TATRO's first name and his mother's maiden name), he stated "I'm pretty sure I had it but someone hacked it .... sometime last year."
He had a Google picture account.

    b.    He downloaded the images that came from NCMEC CyberTipline Report.

    c.    He claimed that his "old phone" was used to upload the images and that he no longer had this phone.  He further claimed that his phone was taken by MetroPCS and that the sim card was taken as well.

    d.    He masturbated to an image of child pornography.

    e.    His "new phone" was inside the residence.  He provided the password and advised that no one, besides himself, knew his password.

    f.    He claimed that there was no child pornography on his "new phone."

    g.    He claimed that there would be 100 images of child pornography on his "old phone."  He uploaded all the images from his phone to Google pictures.

    h.    He denied ever producing child pornography.

    7.    At the end of this interview, the agents told TATRO that they were going to begin searching the residence pursuant to a search warrant.  The agents gave TATRO a copy of the search warrant and told him that he was not going to be allowed inside the house during the search.  Before commencing the search, the agents searched TATRO's pockets to make sure he did not have any weapons or contraband on him and they recovered his "new cell phone," an LG Metro PCS, model LG MS500 Optimus ("TATRO's new cell phone").  As noted above, TATRO had previously claimed to the

agents that his new phone was inside the residence.

8.       During the search warrant, agents recovered, among other items, TATRO's "old cell phone," a black Metro PCS 4G cell phone ("TATRO's old cell phone"), which was located in his bedroom on top of a dresser.  Agent Ziccardi performed a preview forensic examination on TATRO's new cell phone.  This preliminary examination revealed several videos of an adult individual, who appeared to be TATRO, sexually abusing a child, who appeared to be the minor victim.  From the information embedded in the videos, Agent Ziccardi was able to determine that the videos had been made recently, in February and March 2015.  The videos depicted the child being anally raped and being subjected to other acts of sexual abuse.

9.       After the discovery of these videos, TFA Spadafora asked to speak with TATRO again and TATRO agreed to speak with agents a second time.  TATRO was provided with his Miranda warnings and TATRO acknowledged that he understood his rights, and agreed to make further statements to the agents. TFA Spadafora advised TATRO that the agents examined his cell phone and located videos of him sexually abusing his son.  During this second interview, TATRO made the following admissions, among other statements:

   a.     His son, the minor victim, was three years old.

   b.     He had anal intercourse with the child "only twice," and only video-recorded it on these two occasions.

   c.     The sexual abuse took place last year (2014), when he was alone with the child.

d.    The child cried during the sexual abuse and TATRO was sorry that he "did that."

e.    TATRO performed oral sex on the child "only those two times" (suggesting that the oral sex occurred on the same dates that he anally raped the child).

f.    He also had the minor victim perform oral sex on him.

g.    He video recorded himself sexually abusing the minor victim and sent the videos to other people over the Internet, using the Kik messenger application on his phone. He sent the videos to "tons of people."

h.    He was sexually abused himself and he stopped abusing his son because he did not want his son to have that kind of life.

i.    He acknowledged that the images he sent using Kik were being transmitted through the Internet.

j.    He claimed that the other individuals on Kik asked him for the videos so he made them.

k.    He provided his Kik username, "stweiegriffin."

l.    He claimed that he looked at child pornography images to keep himself from sexually abusing his son.

m.    He never told anyone about abusing his child and video-recording it, except for the individuals he spoke to using Kik.

n.    He last sent a video of produced child pornography involving the minor victim in November of 2014.

o.   The sexual abuse of the minor victim took place inside TATRO's bedroom at his residence on Merritt Island.   During this abuse, he inserted his penis into the child's anus, which made the child cry, and he ejaculated on his son's stomach.

p.   He produced the videos of child pornography involving the minor victim by himself using his phone in his room in Merritt Island.

10.   After completing the second interview with TATRO, TFA Spadafora interviewed TATRO's girlfriend, who was the mother of the minor victim.   Later that same day, the minor victim was brought to the Child Advocacy Center of Brevard County where the child was forensically interviewed.   BCSO Agent Wendy Wheeler also went to the Child Advocacy Center to witness the interview.   After the forensic interview, a nurse practitioner attempted to perform a medical examination of the child, however, the child became hysterical and cried "no," when the examiner attempted to examine his anus and surrounding area.   The examination ended as a result.   Department of Children and Families ("DCF") was also advised of the child's abuse.

11.   On or about March 20, 2015, Agent Ziccardi conducted a forensic examination of TATRO's new cell phone, the LG Metro PCS, model LG MS500 Optimus, and TATRO's old cell phone, a black Metro PCS 4G.

12.   The forensic examination of TATRO's new cell phone revealed the following information:

a.   The phone utilized the Android operating system which was capable of being configured to "back-up" photographs, movies, and other files onto Google storage accounts.   The phone was specifically configured by the

7

user to use two different Gmail accounts to back-up data from the phone to Google: (1) "josh16postmus54@gmail.com" and (2) "josh16postmus@gmail.com."   Both accounts used names that included TATRO's first name and the last name of his girlfriend.

b.      The Kik messenger application was installed on the phone, which could be used to chat and transfer photographs and videos to other Kik users, via the Internet.   The user of the phone used the Kik screen name, "stweiegriffin," with a username of joshtatro and josh16postmus@gmail.com.

c.      Partial Kik messages were recovered from the phone, which consisted of communications between the user of the phone and other Kik users. Some of the communications related to trading images of child pornography.

d.      There were numerous videos and photographs of child pornography on the cell phone and the Micro SD card contained in the phone, including produced images of child pornography depicting the minor victim.

e.      EXIF data was embedded onto several of the produced images of child pornography found on this cell phone.   This EXIF data confirmed that these particular images were taken using the camera from TATRO's new cell phone.   GPS data was also encoded onto these particular images by the cell phone.   This GPS data revealed the location where the images were created.

13.     The forensic examination of TATRO's old cell phone revealed the following information:

   a.     The Kik messenger application was also installed on the phone.

   b.     The phone was configured by the user to use TATRO's Gmail account, "josh17hutson@gmail.com," to back-up photographs and other data from the phone to a Google+ online storage account.

   c.     There were numerous videos and photographs of child pornography on this phone, including produced videos and images of child pornography depicting the minor victim.

   d.     The internet history of this phone, included the search terms "underage porn pictures," "kiddite porn," "kiddie porn videos," "what incest means," "what is taboo," "what age do kids start to come," and "what age do kids produce sperm."

   e.     The internet history also revealed that the user had visited sites with the titles "father fucks his boy" and "father fucks his very young boy."

14.     In total, Agent Ziccardi recovered 229 photographs and 14 videos of produced child pornography depicting the minor victim from TATRO's two cell phones. In addition, he recovered 443 photographs and 62 videos of non-produced child pornography.   Of these images and videos, there were 13 photographs depicting bondage.

15.     When a Kik user saves an image or video received via Kik, to a device, such as a cell phone, the video or image is embedded with a unique naming convention referred to as a Globally Unique Identifier ("GUI") format.   This GUI naming format is generated by the Kik application.   Based on this unique Kik generated GUI naming format, a forensic examination can identify what images were received, via Kik and the Internet, on a particular device.   Using this methodology, Agent Ziccardi determined that 11 images of non-produced child pornography that were located on the SD card from TATRO's new cell phone had the unique GUI naming format generated by Kik. Thus, Agent Ziccardi concluded that these 11 images of child pornography had been transported using a means and facility of interstate or foreign commerce, that is, Kik and the Internet, prior to TATRO receiving them on his new cell phone.   These images were saved onto the SD card of TATRO's new cell phone on **February 23, 2015, March 10, 2015,** and **March 11, 2015**, respectively.

16.     On or about April 6, 2015, TFA Spadafora obtained a state court issued warrant that directed Google to disclose data to the BCSO for TATRO's Gmail account, "josh17hudson@gmail.com."   On or about May 28, 2015, TFA Spadafora received a thumb drive from Google containing the data from this account.   A review of these Google records revealed that there were approximately 1,110 images of child pornography stored on TATRO's Gmail account.   Some of these images depicted infants being sexually abused as well as bondage acts involving prepubescent children.   In addition, 83 of these images of child pornography depicted the minor victim.

17.     If TATRO's girlfriend and her parents were called to testify in the trial of this case, they would establish the following beyond a reasonable doubt:

a.      TATRO lived at TATRO's residence with his girlfriend, the minor victim, and his girlfriend's parents, who are the minor victim's grandparents.

b.      The minor victim would be left in TATRO's care and custody when his girlfriend went to work.

c.      From the age of two, the minor victim would grab his anus frequently as if irritated in that part of his body.

d.      The minor victim was disabled and only started speaking when he turned approximately two.

e.      TATRO was constantly on his cell phone and knew the password to the Wi-Fi Internet service at TATRO's residence.

f.      TATRO had, in the past, helped his girlfriend's parents when they had trouble with their cell phones.

g.      TATRO was known to have several email addresses.

18.     The following items are admissible in evidence, pursuant to the Federal Rules of Evidence:

a.      TATRO's new cell phone.

b.      TATRO's old cell phone.

c.      The contents of both cell phones discovered during the forensic examinations, including the child pornography described in this stipulation.

d.      The aforementioned thumb drive that Google provided to the BCSO,

containing the data that was stored on TATRO's Gmail account, including the child pornography stored therein.

e.   Records from MetroPCS establishing beyond a reasonable doubt that TATRO's phone number was subscribed in his girlfriend's name, and that TATRO's residence is the address that MetroPCS has on file for this phone number.

f.   Records from Bright House Networks establishing beyond a reasonable doubt that the IP address used to upload the child pornography images that led to the aforementioned NCMEC CyberTipline Report was subscribed to the father of TATRO's girlfriend, and that TATRO's residence is the address that Bright House Networks has on file for this IP address.

19.   The following videos and images that were located on TATRO's new cell phone are admissible as evidence, pursuant to the Federal Rules of Evidence, and establish the following beyond reasonable doubt (based on either the GPS data embedded onto these images or TATRO's aforementioned statements to law enforcement, all of the below-listed child pornography was produced in Brevard County):

a.   Image "CAM00266," depicting TATRO's penis being inserted into the minor victim's anus (from the EXIF data embedded onto the image, this image was produced on or about October 26, 2014).

b.   Image "CAM00270," depicting TATRO lying on his back nude from the waist down while the minor victim is straddled over TATRO as TATRO inserts his penis into the child's anus (from the EXIF data embedded onto the image, this image was produced on or about October 26, 2014).

c. Image "CAM00354," depicting the minor victim holding TATRO's erect penis and performing oral sex on TATRO (from the EXIF data embedded onto the image, this image was produced on or about November 6, 2014).

d. Image "CAM00362," depicting the minor victim lying on his back with his shorts and diaper pulled down to his knees as a penis is inserted into the child's anus (from the EXIF data embedded onto the image, this image was produced on or about November 6, 2014).

e. Image "CAM00458," depicting TATRO performing oral sex on the minor victim with TATRO's face visible in the photograph (from the EXIF data embedded onto the image, this image was produced on or about November 15, 2014).

f. Image "CAM00491," depicting a close-up of the minor victim's anus with fingers spreading the child's anus apart (from the EXIF data embedded onto the image, this image was produced on or about November 20, 2014).

g. Image "CAM00503," depicting a close-up of TATRO performing oral sex on the minor victim with TATRO's face visible in the photograph (from the EXIF data embedded onto the image, this image was produced on or about November 21, 2014).

h. Image "CAM00860," depicting the minor victim lying on top of TATRO with his hand next to TATRO's erect penis (from the EXIF data embedded onto the image, this image was produced on or about January 18, 2015).

i. File "CAM00081.3gp," depicting TATRO performing oral sex on the minor victim (from the EXIF data embedded onto this file, the file was created on

13

TATRO's new cell phone on or about February 16, 2015).

j.      File "CAM00197.3gp," depicting the minor victim lying on his stomach while TATRO inserts his penis into the child's anus as the child screams and cries for TATRO to stop (from the EXIF data embedded onto this file, the file was created on TATRO's new cell phone on or about March 8, 2015).

k.      File "CAM00201.3gp," depicting TATRO lying on his back nude in a bed with the minor victim on top of TATRO as TATRO anally rapes the child while the child moves around in an attempt to get away from TATRO (from the EXIF data embedded onto this file, the file was created on TATRO's new cell phone on or about March 10, 2015).

l.      The 11 images of non-produced child pornography were saved onto the SD card of TATRO's new cell phone on February 23, 2015, March 10, 2015, and March 11, 2015, respectively.   As noted above, these images were received via Kik and the Internet.

20.     TATRO's cell phones that were used to produce the images of child pornography discussed above, were manufactured using materials that had been mailed, shipped, or transported in interstate or foreign commerce.

21.    All of the images of child pornography that TATRO produced of the minor

victim, the images of child pornography that he possessed on March 17, 2015, and the

images of child pornography that he received on February 23, 2015, March 10, 2015, and

March 11, 2015, constituted "child pornography" as that term is defined in 18 U.S.C.

§ 2256.

So stipulated this ____ day of _____, 2016.

Respectfully submitted,

A. LEE BENTLEY, III
United States Attorney

Angela Parrott
Assistant Federal Defender
North Carolina Bar No. 0035490
201 South Orange Avenue, Suite 300
Orlando, FL 32801
Telephone:   (407) 648-6338
Facsimile:    (407) 648-6095
E-mail: angela_parrott@fd.org

Andrew C. Searle
Assistant United States Attorney
Florida State Bar No. 0116461
400 West Washington Street, Suite 3100
Orlando, Florida   32801
Telephone:   (407) 648-7500
Facsimile:    (407) 648-7643
E-mail: Andrew.Searle@usdoj.gov

JOSHUA ADAM TATRO, Defendant

15