**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

UNITED STATES OF AMERICA,

v.                                                          Case No. 6:15-cr-176-Orl-37KRS

JOSHUA ADAM TATRO.

_____

**ORDER**

This cause is before the Court on the following:

1.    Defendant's Motion to Suppress Statements and Request for an Evidentiary

Hearing (Doc. 58), filed April 14, 2016;

2.    Defendant's Motion to Suppress Evidence Outside Scope of Probable

Cause and Request for an Evidentiary Hearing (Doc. 59), filed April 14,

2016; and

3.    United States' Response to Defendant's Motion to Suppress (Doc. 69), filed

May 4, 2016.

**BACKGROUND[1]**

**I.    The Report**

On January 24, 2015, the National Center for Missing and Exploited Children

("**NCMEC**") generated CyperTipline Report No. 2582238 ("**CyperTipline Report**")

concerning an individual using the email address of joshu17hudson@gmail.com

_____

[1] The Court draws the following facts from the evidence presented at a hearing on the motions held on Thursday, May 12, 2016, and Friday, May 13, 2016. The transcript of the hearing has not been published. The Court cited the parties' briefs and exhibits where they were consistent with the evidence introduced at the hearing.

("**Google User**") and Merritt Island, Florida IP address "142.197.64.38" ("**IP Address**") to upload child pornography images on a Google online service. (Doc. 69, p. 1; Doc. 59, p. 1.) NCMEC staff discovered the following:

- On January 23, 2015, Google User used the IP Address to upload fourteen images of child pornography ("**14 Photos**") onto Google+ Photos ("**Upload**");

- Google User's telephone number was 321-458-5324 ("**Phone Number**");

- On or about January 24, 2015, Google notified NCMEC of the Upload and submitted the 14 Photos to NCMEC;

- The Phone Number was associated with Defendant's girlfriend and was listed on a Facebook page for a user named "Josh Tatro"[2];

- Josh Tatro was a 23-year old male who had a son and lived at 1460 Fiddler Avenue in Merritt Island—the home of his girlfriends' parents ("**Residence**") (collectively, the "**Information**").

(Doc. 69, pp. 1–2.) NCMEC included the Information and the 14 Photos in the CyperTipline Report and referred it to the Brevard County Sheriff's Office ("**BCSO**"). (*Id.*; Doc. 59, p. 2.)

BCSO Agent Michael Spadafora, who was assigned to review the CyberTipline Report: (1) confirmed that the 14 Photos depicted child pornography under federal and state law; (2) determined that the IP Address was subscribed to "Brian Postmus"—the father of Defendant's girlfriend—at the Residence; (3) confirmed that the Phone Number was subscribed to Defendant's girlfriend; and (4) determined that Defendant, his girlfriend, and his girlfriends' parents all lived at the Residence. (Doc. 69, p. 3.)

On March 5, 2015, Agent Spadafora conducted surveillance at the Residence and

---

[2] Defendant's name is Joshua Adam Tatro.

confirmed that the IP Address was secured such that "only users with access to the internet service at the [Residence] could use the internet there." (*Id.*)

Based on the foregoing information, Agent Spadafora applied for and obtained a warrant to search the Residence and its curtilage for evidence of possession and distribution of child pornography ("**Search Warrant**"). (*Id.*; *see also* Docs. 69-1, 69-2.) The Search Warrant delineated the items for which agents were authorized to search, including computer hardware, software, and storage media, variations of "[c]omputer input and output devices," and "pocket" computers. (Doc. 69-2, pp. 2–4.) Additionally, the Search Warrant permitted agents to conduct an "off-site" search of any such items or to delegate a search to a computer forensic analyst. (*Id.* at 5.) Agent Spadafora's affidavit did not specifically mention the intended search of "cell phones," and the Search Warrant did not specifically provide for a search of "cell phones." (*See* Doc. 59, pp. 2–3; *see also* Docs. 69-1, 69-2.)

Subsequent surveillance on March 17, 2015, revealed Defendant and a young child exiting a vehicle parked at the Residence.[3] (Doc. 69, p. 4.) The young child was later revealed to be Defendant's three-year-old son ("**Minor**").

## II.    The Interviews

Later on March 17, 2015, Agent Spadafora knocked on the door to the Residence and, when an occupant opened the door, he observed Minor inside and asked to speak with Defendant.[4] (*Id.*) Defendant approached and a recorded interview ensued in the

---

[3] Agent Spadafora recognized Defendant from a photograph he received from the Florida Driver's and Vehicle Information Database.

[4] There were several other agents involved in the execution of the Search Warrant at the Residence on March 17, 2015.

garage ("**First Interview**"). (*Id.*; Doc. 59, p. 4.) The First Interview was non-custodial. (Doc. 69, p. 4; Doc. 58, p. 2.)

The Government contends that, at the outset of the First Interview, "Defendant was deliberately evasive and misleading," exemplified by his denial of wrongdoing and association with the Google User email address and Phone Number. (Doc. 69, p. 4.) Defendant then admitted that he used the Google User email address and claimed that it had been "hacked" in the past year. (*Id.* at 5.) Defendant eventually admitted that: (1) he obtained child pornography from an adult website; (2) he used his old cell phone ("**Old Cell Phone**")—which contained approximately 100 images of child pornography— to access the internet at the Residence and to use his Google account, which he claimed to no longer have; (3) he had a new phone that did not contain child pornography ("**New Cell Phone**"); (4) he masturbated to images of child pornography, although he denied ever sexually abusing children; (5) his girlfriend's parents paid for the internet at the Residence; and (6) he took care of Minor when Minor was not in school (collectively, "**First Interview Statements**"). (*Id.*; Doc. 59, pp. 4–5.) Defendant does not challenge the First Interview Statements.[5]

At the conclusion of the First Interview, which lasted approximately thirty minutes, Agent Spadafora began executing the Search Warrant. (Doc. 69, p. 5; Doc. 58, p. 2.) Execution of the Search Warrant revealed the New Cell Phone in Defendant's pocket[6]

---

[5] At the Hearing, defense counsel affirmatively indicated that Defendant does not challenge the constitutionality of the First Interview Statements.

[6] Per his practice, Agent Spadafora conducted a pat down search of Defendant's person for weapons for purposes of officer safety. Moreover, the Search Warrant authorized Agent Spadafora to search "any person[] located on the premises [of the Residence] or within the curtilage reasonably believed to be connected with" the suspected possession of child pornography. (Doc. 69-2, p. 5.)

and the Old Cell Phone in Defendant's bedroom. (Doc. 69, pp. 5–6; Doc. 59, p. 5.) Pursuant to the Search Warrant, BCSO Agent Vincent Ziccardi—a computer forensic analyst—conducted an off-site forensic examination ("**Exam**") of the New Cell Phone and its secure digital card ("**SD Card**") while Agent Spadafora searched the Residence. The Exam—which took about an hour to complete—revealed videos of Defendant sexually abusing Minor ("**Phone Discovery**"). (*Id.* at 6; *see also* Doc. 58, p. 2.)

After the Phone Discovery, Defendant agreed to talk with Agent Spadafora again, prompting a second interview in Defendant's bedroom ("**Second Interview**"). (Doc. 69, p. 6.) The Second Interview began with Agent Spadafora reading Defendant his *Miranda* rights, which Defendant allegedly waived.[7] (*Id.*; Doc. 58, p. 2.) Agent Spadafora then realized that his effort to record the Second Interview had failed, reactivated the recording device, and re-administered the *Miranda* warnings, which Defendant again allegedly waived.[8] (Doc. 69, p. 6.) While receiving *Miranda* warnings the second time, Defendant asked the agents to shut his bedroom door. (*Id.* at 7; Doc. 58, p. 2.) After the *Miranda* warnings, Defendant "gave several additional incriminating statements regarding the possession of child pornography, the production of child pornography[,] and of the sexual abuse of minors under the age of eleven." (Doc. 58, p. 3.) Specifically, Defendant admitted to: (1) sexually abusing Minor; (2) producing images and videos of the sexual abuse of Minor; and (3) distributing the child pornography to others ("**Incriminating Statements**").

---

[7] The Government contends that Defendant waived his rights, but did not have a recording of this alleged waiver.

[8] When Agent Spadafora completed the reading of the *Miranda* warnings, he asked Defendant, "do you understand those questions?" (Doc. 58, p. 3.) Defendant responded, "yeah" and then continued to talk to the Agents. (*Id.*) The Government contends the response and continued conversation amounts to a waiver.

(Doc. 69, p. 7.) "Defendant also mentioned, for the first time, that he had a disability that made it difficult for him to remember things." (*Id.*) Ultimately, Defendant was arrested and taken to the Brevard County Jail.

At the conclusion of the Second Interview, Agent Spadafora interviewed Defendant's girlfriend and, the following day, he interviewed the girlfriend's parents. (*Id.*) According to the Government, these interviews revealed that: (1) "although the Defendant had a low-functioning intellectual ability, the Defendant was capable of making every day decisions of consequence"; (2) Defendant "understood the difference between right from wrong"; and (3) they "trusted the Defendant to care for [Minor] based on their belief that he was a functional and competent person." (*Id.*)

## III.     Procedural Posture

On July 30, 2015, a Grand Jury returned an Indictment that charged Defendant with thirteen counts of various child pornography offenses, including receipt, possession, production, and enticement.[9] (Doc. 1.) Defendant was arrested and, at his initial appearance, pled not guilty to all charges. (Doc. 7.)

Upon motion by defense counsel (Doc. 19), on September 30, 2015, the Court ordered Defendant to the custody of the Attorney General for a psychiatric and psychological examination (Doc. 22).

After a series of continuances (*see* Docs. 25, 26, 28, 29) and a change in counsel (*see* Docs. 48, 50, 52), the Court found good cause to consider two untimely motions to suppress by the defense (Docs. 28, 29 ("**Suppression Motions**"); *see also* Doc. 67). The

---

[9] Also pending is a criminal action against Defendant in the Circuit Court of the Eighteenth Judicial Circuit, in and for Orange County, Florida. (*See* Doc. 58, p. 3.)

Government responded in opposition to the Suppression Motions (Doc. 69), and the Court held a hearing on the Suppression Motions on Thursday, **May 12, 2016**, which continued on Friday, **May 13, 2016** ("**Hearing**") (Docs. 73, 74).

## IV.    The Hearing

At the Hearing, Agent Spadafora corroborated the details of the investigation of the CyberTipline Report and Interviews. Agent Spadafora testified that he had no reason to believe that Defendant suffered from any intellectual disability preventing him from understanding what he was being asked or told.   As to the First Interview, Agent Spadafora testified that Defendant was being deliberately dishonest about his lack of knowledge regarding the Google User and Cell Phones. Agent Spadafora also testified that, when administering *Miranda* warnings, if the person receiving the warnings appears not to understand what is said, he further explains the warnings, and—if the receiver still appears not to comprehend his or her rights—he terminates the interview. He testified that he had no reason to believe that Defendant did not understand or comprehend the warnings given.

Agent Spadafora testified that the Search Warrant authorized him to search "any electronic device that would collect and hold images of child pornography." He did not specifically request to search cell phones because he believed the authorization to search computers and "pocket computers" encompassed smartphones. He conceded on cross-examination that he has specifically requested to search cell phones in prior search warrant applications.

Finally, Agent Spadafora testified that he intended to interview Minor regardless of the Phone Discovery. He would have obtained a search warrant for the Cell Phones

based on the First Interview Statements if they had not been covered by the Search Warrant that was issued.

Agent Ziccardi testified that the Search Warrant authorized him to search and examine the SD Card and the Cell Phones, which he viewed as modern day computers that "could contain the evidence [the Agents] were seeking."

The defense introduced expert testimony from Dr. Robert Elliot Kohen regarding Defendant's developmental history based on his: (1) four-hour evaluation of Defendant; (2) evaluation of records of Defendant's past psychiatric and psychological evaluations and developmental history, medical records, and school records; and (3) review of the BOP Report. Dr. Kohen testified that Defendant suffered from a developmental delay—microcephaly—that prevented his brain from adequately forming as an infant. He further opined that Defendant: (1) has a low comprehension ability; (2) has a moderately low memory composite, which means that he can easily be confused when people speak quickly to him or give him a lot of information; (3) has a "severely low" ability to quickly and accurately process information; (4) is "intellectually deficient in the moderately impaired range," which causes him to have difficulty understanding and making good decisions; and (5) is easily manipulated.

On cross-examination, Dr. Kohen agreed that Defendant: (1) accurately recalled details regarding his history; (2) does not suffer from delusions or hallucinations; (3) exhibits organized, rational, and concrete thought processes; and (4) understands what he did and that there are legal consequences for his actions. Dr. Kohen did not conduct a competency evaluation of Defendant, nor did he listen to the audio recordings of Defendant's interaction with the Agents at the scene.

The Court announced its findings of fact from the bench and advised the parties' of its intention to deny the Suppression Motions. This Order memorializes those findings.

**STANDARDS**

**I.      Fourth Amendment**

The Fourth Amendment requires warrants to "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. When a search exceeds the scope of a warrant, "evidence obtained in that search may be excluded." *United States v. Hendrixson*, 234 F.3d 494, 497 (11th Cir. 2000). However, "[o]nly the evidence seized while [law enforcement officers] are acting outside of the boundaries of the warrant is subject to suppression." *Id.* "Total suppression may be appropriate where the executing officer's conduct exceeds any reasonable interpretation of the warrant's provisions." *United States v. Wuagneux*, 683 F.2d 1343, 1354 (11th Cir. 1982.)

**I.      Fifth Amendment**

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As such, the U.S. Supreme Court has put in place protective measures to ensure that "custodial interrogation cannot occur before a suspect is warned of his or her rights against self-incrimination"—that is, a suspect must be warned of his *Miranda* rights at the outset of a custodial interrogation. *Miranda v. Arizona*, 382 U.S. 436, 445 (1966). "Under *Miranda*, the statement of a defendant who has not been warned cannot be used at trial if the statement was the product of interrogation conducted while the defendant was in custody." *United States v. Rehaif*, --- F. Supp. 3d ---, 2016 WL 1337265, at *3 (M.D. Fla.

Apr. 1, 2016).

## DISCUSSION

Defendant moves to suppress: (1) the Phone Discovery (Doc. 59 ("**Phone Motion**")); and (2) the Incriminating Statements (Doc. 58 ("**Statement Motion**")). In support, Defendant argues that the Phone Discovery was obtained in violation of his Fourth Amendment Rights (Doc. 59) and that the Incriminating Statements were obtained in violation of his Fifth Amendment rights (Doc. 58). The Court will address each Motion in turn.

## I.     Phone Motion

Defendant argues that the Agents exceeded the scope of the Search Warrant when they searched and seized the Cell Phones and SD Card and, therefore, moves for suppression of the Phone Discovery. (Doc. 59.) In support, Defendant maintains that the Search Warrant—which "only specified the search and seizure of certain child pornography images and 'computers' and related material"—did not cover the search or seizure of cell phones. (*Id.*) Moreover, Defendant contends that the Search Warrant "provided too much discretion for law enforcement to determine for itself what could be searched and seized" ("**Discretion Argument**"). (*Id.* at 7.) The Court disagrees.

At the outset, the Court rejects the Discretion Argument based on its finding that the Search Warrant was sufficiently particularized and was not overbroad. Importantly, "the [Search Warrant] identified the types of property authorized to be seized and indicated the crimes involved for which evidence was sought." *U.S. v. Conrad*, No. 3:12-cr-134-J-34TEM, 2013 WL 4028273, at *9 (M.D. Fla. Aug. 7, 2013) (finding that a search warrant similar to the Search Warrant here satisfied the particularity requirement

of the Fourth Amendment in that it "limited the search to computer equipment, digital storage devices, and accessories that could contain contraband and evidence linked to the child pornography offenses specified in the warrant").

Further, the Court finds that the language of the Search Warrant permitted the search and seizure of the Cell Phones and SD Card. Indeed, the terms "pocket computer" and "computer storage media" encompass cell phones, as modern cell phones are mini computers that have "immense" storage capacity. *See Riley v. California*, 134 S. Ct. 2473, 2489 (2014); *United States v. Wurie*, 728 F.3d 1, 8 (1st Cir. 2013); *U.S. v. Flores-Lopez*, 670 F.3d 803, 805 (7th Cir. 2012); *United States v. Phillips*, 9 F. Supp. 3d 1130, 1141 (E.D. Cal. 2014).[10] Additionally, in the Court's view, the terms "computer storage media" and "computer related storage devices," which include "storage which can be accessed by computers to store or retrieve data or images of child pornography," adequately cover the SD Card. Thus, the Agents were authorized to search the New Cell Phone and its SD Card. *See United States v. Hendley*, No. 1:14-cr-453-ODE-JSA, 2015 WL 7779215, at *4 (N.D. Ga. Dec. 1, 2015) (stating that, when a warrant authorizes agents to "look for digital evidence of child pornography," "logic dictates that searching for digital files would require agents to access repositories that store digital information, including cell phones").

In any event, the Court is persuaded that the search and seizure of the Cell Phones and SD Card were adequately protected by the good faith exception and the inevitable discovery doctrine. In the case of an overbroad search warrant, evidence obtained during execution of the search warrant will not be excluded when law enforcement officers "act

---

[10] While these cases discuss modern cell phones in the context of a search incident to arrest, the Court finds persuasive their language regarding the capabilities of modern cell phones and their comparability to computers.

in the 'objectively reasonable belief that their conduct does not violate the Fourth Amendment'" ("**Good Faith Exception**"). *U.S. v. Travers*, 233 F.3d 1327, 1329 (11th Cir. 2000) (quoting *United States v. Leon*, 468 U.S. 897, 918 (1984)). Pursuant to the Good Faith Exception, "evidence obtained in violation of the Fourth Amendment by officers acting in objectively reasonable reliance on a search warrant [that fails to meet the particularity requirements of the Fourth Amendment] issued by a neutral and detached magistrate need not be excluded, as a matter of federal law, from the case in chief of federal and state criminal prosecutions."[11] *Leon*, 468 U.S. at 927 (1984 (Blackmun, J., concurring); *accord id.* at 924–926 (majority opinion). "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id.* at 927 (majority opinion). There is no evidence here that the Agents acted with intentional deceit or in bad faith or that they deliberately exceeded the scope of the Search Warrant. The Agents testified unequivocally that they believed the Cell Phones and SD Card to be covered by the Search Warrant.[12] Thus, the Agents acted in good faith in executing the Search Warrant and the search and seizure of the Cell Phones and SD Card are covered by the Good Faith Exception.

---

[11] "[O]fficers do not act in objective good faith . . . if the warrant is so overly broad on its face that the executing officers could not reasonably have presumed it to be valid." *Travers*, 233 F.3d at 1330. Here, that is not the case. *See Conrad*, 2013 WL 4028273, at *9. Even if the Search Warrant were indeed "overbroad," it is not so overbroad to be "facially deficient" in that it fails "to particularize the place to be searched or the things to be seized" such that "the executing officers could not have reasonably presumed it to be valid." *See id.*; *see also Travers*, 233 F.3d at 1330.

[12] Indeed, the Supreme Court's description of modern cell phones as the equivalent of mini computers, *see Riley*, 134 S. Ct. at 2489, supports such a belief.

The Court is additionally persuaded that the Agents would have inevitably discovered the Phone Discovery. "[E]vidence that results from an illegal search or seizure is nonetheless admissible if 'the information ultimately or inevitably would have been discovered by lawful means.'" *Jefferson v. Fountain*, 382 F.3d 1285, 1295 (11th Cir. 2004) (quoting *Nix v. Williams*, 467 U.S. 431, 449 (1984)). "In order for evidence to qualify for admission under [the Inevitable Discovery Doctrine], there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." *Jefferson*, 382 F.3d at 1296 (citing *United States v. Brookins*, 6:14 F.2d 1037, 1042 n.2 (5th Cir. 1980)).[13] Here, the prosecution adequately demonstrated that it was actively pursuing an investigation of Defendant relating to child pornography. Moreover, the evidence shows that the Agents would have obtained a search warrant with particularized reference to cell phones based on the First Interview Statements, inevitably leading to the search and seizure of the Cell Phones and SD Card and discovery of the Phone Discovery. As such, the Inevitable Discovery Doctrine prohibits exclusion of the Phone Discovery and the Phone Motion is due to be denied.

## II.   Statement Motion

Defendant argues that the Second Interview was a custodial interrogation, implicating his Fifth Amendment right against self-incrimination and entitling him to *Miranda* warnings. (Doc. 58.) He argues that he did not make a knowing, intelligent, and

---

[13] Decisions of the Fifth Circuit rendered on or before September 30, 1981, are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981)

voluntary waiver of his *Miranda* rights and, consequently, the Incriminating Statements must be suppressed. (*Id.*) The Government contests the custodial nature of the Second Interview and, alternatively, argues that Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights. (Doc. 69, pp. 9–11.)

### a. Custody

It is undisputed that "the right to *Miranda* warnings attaches when custodial interrogation begins." *U.S. v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). To determine whether a suspect is "in custody," the Supreme Court has set out two distinct inquiries. "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The "ultimate inquiry" is whether there was a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.*; *see also Brown*, 441 F.3d at 1347 (explaining that, whether a defendant was in custody "depends on whether[,] under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave"). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *Brown*, 441 F.3d at 1347. Relevant factors to the "freedom of movement" inquiry include the location of questioning, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning. *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). Not all restraints on freedom of movement amount to custody for purposes of *Miranda*; the inquiry is "whether the

relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*

The circumstances surrounding the Second Interview compel a finding that the Second Interview was custodial in nature. The Second Interview occurred after the Agents uncovered the Phone Discovery and located evidence that a sexual battery had occurred. The Court is persuaded that, at this point, a reasonable person would not have felt free to walk away.

The Government relies on *Brown* for the proposition that "courts are much less likely to find the circumstances custodial when the interrogation occurs in a familiar setting, such as the suspect's home." (Doc. 69, p. 10.) Indeed, "[c]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in a familiar or at least neutral surroundings." *Brown*, 441 F.3d at 1348 (collecting cases). However, while the *Brown* court considered the location of the interview—in the home of the defendant's girlfriend, where defendant often spent his time—and his freedom to move about the house as significant factors to its determination that the defendant was not in custody, *see id.* at 1348–49, the court explicitly indicated that the "most important" factor in its consideration was that the interviewing officers told the defendant *three times* that he was not under arrest, that he was not in custody, and that he was free to go at any time, *id.* at 1347 (explaining that such advisement will "generally lead to the conclusion that the defendant is *not* in custody"). Here, the Agents did not tell Defendant that he was free to leave or that he was not under arrest. In fact, they did just the opposite in that they recited the *Miranda* warnings, suggesting that Defendant was *not* free to leave and that he *was* subject to arrest. As such, the Court rejects the Government's argument and finds that

15

Defendant was in custody during the Second Interview, thereby triggering his right to *Miranda* warnings.

**b.    Waiver**

It is undisputed that Agent Spadafora read Defendant his *Miranda* rights at the commencement of the Second Interview[14]; thus, the Court turns to Defendant's argument that he did not make a knowing, intelligent, and voluntary waiver of those rights.

> The Supreme Court has held that the inquiry into whether a defendant has waived his rights under *Miranda* voluntarily, knowingly[,] and intelligently has two distinct dimensions:
>
> > First[,] the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion[,] or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. **Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.**

*Dunkins v. Thigpen*, 854 F.2d 394, 398 (11th Cir. 1988) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (emphasis added)).

As to the first part of the inquiry, there is no evidence of intimidation, coercion, or deception on the part of the Agents; accordingly, the Court finds that Defendant voluntarily

---

[14] Agent Spadafora's recitation of the *Miranda* warnings was not a model of clarity, but it sufficiently advised Defendant of his rights in satisfaction of the Fifth Amendment. *See Missouri v. Seibert*, 542 U.S. 600, 611 (2004) ("[N]o talismanic incantation is required to satisfy *Miranda*'s strictures . . . . The inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*." (citations omitted)).

relinquished his *Miranda* rights when he continued to engage in the Second Interview after being read those rights. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (indicating that the voluntariness determination is focused on the presence of police coercion).

As to the second part of the inquiry, Defendant has the burden of establishing that, under the totality of the circumstances, he did not knowingly and intelligently waive his rights before speaking to the Agents. *Dunkins*, 854 F.2d at 298. As in *Dunkins*, while Defendant's intellectual impairment was established and is a relevant factor, the totality of the circumstances surrounding the confession indicate that Defendant did understand and knowingly and intelligently waive his rights. *See id.*

Dr. Kohen's testimony established that Defendant does indeed suffer from a mental disability or infirmity and a diminished IQ. However, "diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights." *Dunkins*, 854 F.2d at 400; *see also Garner v. Mitchell*, 557 F.3d 257, 260–61 (6th Cir. 2009). Moreover, Dr. Kohen's testimony was undermined to some extent by the fact that he did not listen to the audio recordings of the interactions surrounding the First or Second Interview or the recitation of and response to the *Miranda* warnings.

The totality of the circumstances surrounding the delivery of the *Miranda* rights indicate that Defendant knowingly and intelligently waived those rights. This finding is supported by the following facts:

> (1)    Defendant responded to the questions asked of him and, during the First Interview, made a number of attempts to mislead the Agents or evade truthful responses to their inquiries[15];

---

[15] The *Garner* court recognized this type of act as "more consistent with a person

(2)    Defendant was sufficiently competent to load and operate programs on his cell phones, including Google Plus and a private messaging service, and to download and store images electronically;

(3)    review of the audio recordings of the First and Second Interviews revealed that Defendant was capable of providing passwords and recognized that it was bad conduct to possess or view child pornography and to sexually abuse children;

(4)    review of the private conversations between Defendant and third parties revealed that Defendant understood that sexual abuse and possession of child pornography is an unlawful activity, as Defendant specifically warned a third party that such activity should not be done on a computer because law enforcement could become aware of the illegal activity that way[16];

(5)    the BOP Report indicated that, despite his mild intellectual disability, Defendant was able to understand the nature of the charges, the role of lawyers, judges, and the courts, provide assistance to counsel, and, ultimately, stand trial (*see* Doc. 46, pp. 5–6); and

(6)    Defendant's girlfriend and her parents indicated that, although slow, Defendant was able to care for himself, was trusted with care of Minor, and knew right from wrong.

Ultimately, Defendant's conduct during and leading up to the Second Interview supports a finding that Defendant comprehended his *Miranda* rights and was capable of making a knowing and intelligent waiver of those rights.[17] As such, the Statement Motion

---

attempting to avoid being caught than a person who did not know what he was doing." 557 F.3d at 265–66.

[16] The Court admitted these conversations—Government's Exhibits 7 and 8—into evidence over Defendant's objection. Government's Exhibit 7 revealed Defendant stating to a third party: "Never use laptops for young porn or never use computers to find young porn that [sic] how the law finds you."

[17] This Court agrees with the concurring opinion in *Garner* that: (1) the "primary

is due to be denied.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendant's Motion to

Suppress Statements and Request for an Evidentiary Hearing (Doc. 58) and Defendant's

Motion to Suppress Evidence Outside Scope of Probable Cause and Request for an

Evidentiary Hearing (Doc. 59) are **DENIED**.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on May 31, 2016.



ROY B. DALTON JR.
United States District Judge

Copies:

Counsel of Record

---

focus" of the knowing and intelligent inquiry is not what the issuing officers believed but rather whether the defendant was actually capable of making a knowing and voluntary waiver; and (2) the knowing and intelligent requirement serves a broader purpose than simply the deterrence of police misconduct. *See Garner*, 557 F.3d at 273 (Cole, J., concurring).