1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                   ORLANDO DIVISION

3              Docket No. 6:15-cr-176

4  . . . . . . . . . . . . . .
   UNITED STATES OF AMERICA    :
5                              :         Orlando, Florida
          Plaintiff           :         November 21, 2016
6                              :         1:38 p.m.
              v.               :
7                              :
   JOSHUA ADAM TATRO           :
8                              :
          Defendant           :
9  . . . . . . . . . . . . . .

10

11              TRANSCRIPT OF SENTENCING
         BEFORE THE HONORABLE ROY B. DALTON, JR.
12              UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15

16  For the Plaintiff:  Andrew C. Searle

17

18  For the Defendant:  James T. Skuthan

19

20

21
    Court Reporter:    Amie R. First, RDR, CRR, CRC, CPE
22                     AmieFirst.CourtReporter@gmail.com

23

24  Proceedings recorded by mechanical stenography.

25  Transcript produced by Computer-Aided Transcription.

```
 1                   P R O C E E D I N G S

 2                        * * * * *

 3            THE DEPUTY CLERK:  Case Number

 4   6:15-cr-176-ORL-37KRS, United States of America versus

 5   Joshua Adam Tatro.

 6            Counsel, please state your appearance for the

 7   record.

 8            MR. SEARLE:  Good afternoon, Your Honor.  For the

 9   United States, Andrew Searle.  Sitting with me is Task

10   Force Agent Michael Spadafora from Homeland Security

11   Investigations.  He's the case agent in this matter.

12            THE COURT:  Good afternoon.

13            MR. SKUTHAN:  Good afternoon, Your Honor.  James

14   Skuthan on behalf of Mr. Tatro.  Sitting with me is Brianna

15   Geary, who is an investigator with our office who worked on

16   the case.

17            THE COURT:  Good afternoon.

18            Good afternoon, Mr. Tatro.

19            For counsel, while I'm getting my paperwork in

20   order, I just wanted to let you both know that I have had

21   an opportunity to review both the United States and the

22   defense sentencing memorandum.  And I've also had an

23   opportunity to review the extensive presentence report as

24   well as all the documents that were submitted by the

25   defense under seal.
```

1          Are either of you aware of anything else I should

2    have received and reviewed prior to proceeding with the

3    imposition of sentence?

4          Mr. Searle?

5          MR. SEARLE:  No, Your Honor.

6          THE COURT:  Mr. Skuthan?

7          MR. SKUTHAN:  Your Honor, we filed two character

8    letters on Friday.  I don't know if the Court saw those.

9          THE COURT:  I did see them.  I've skimmed them.

10   I'll try to take a look.  They're obviously outside of my

11   seven-day period.  So I took the materials that I had.  I

12   invested a fair amount of time in them last week.  So I've

13   received those, but I haven't looked at them carefully.

14         Joshua Adam Tatro, on July the 6th of 2016,

15   the Court found you guilty of counts one through nine of an

16   indictment that charged you with the production of child

17   pornography, a violation of Title 18 of the United States

18   Code, Section 2251(a).

19         Counts 10 through 12 of that indictment that

20   charged you with the receipt of child pornography, in

21   violation of Title 18 of the United States Code,

22   Section 2252A(a)(2)(B).

23         And count 13 of the indictment that charged you

24   with possession of child pornography, in violation of

25   Title 18 of the United States Code, Section 2252A(a)(5)(B).

1          The court adjudicated you guilty of those

2     offenses.

3          We're here now for sentencing.  The way we'll

4     proceed, Mr. Tatro, is that I'm going to in a moment speak

5     to the lawyers about any issues that need my attention with

6     respect to the way the guidelines were computed or the

7     factual findings generated by the probation office and the

8     presentence report.

9          And then I'm going to give Mr. Searle an

10    opportunity to speak on behalf of the United States after

11    which I'll hear from Mr. Skuthan who will bring to my

12    attention anything he thinks I should consider in addition

13    to what's been described in his sentencing memorandum that

14    might be a mitigating circumstance.

15         And then last but not least, Mr. Tatro, I'll give

16    you an opportunity to make remarks to the Court directly if

17    you'd like to avail yourself of that opportunity.

18         Mr. Skuthan, have you had an opportunity to go

19    through the presentence report with Mr. Tatro?

20         MR. SKUTHAN:  Yes, Your Honor, I have.

21         THE COURT:  Are there any unresolved objections to

22    either the facts or the way the guidelines were calculated?

23         MR. SKUTHAN:  Your Honor, I'm in a very unique and

24    uncomfortable position -- I think the Court understands

25    that -- because Mr. Tatro has pending charges in state

1  court which arise out of the exact same activities that

2  were alleged in the instant indictment.

3         There is an objection to all the facts in the

4  offense conduct, which is paragraphs 19 through 41.

5         As to acceptance of responsibility, which is

6  paragraph 78, I think it's difficult for the Court to award

7  acceptance of responsibility if the defendant does not

8  agree with the facts that have been put forth by the

9  Government.  I understand that.  But defendant is in a

10  peculiar situation.

11         And I'm not suggesting this is brought about by

12  the Court or probation or anybody else.  But I just think I

13  have to put on the record that after the suppression

14  hearing, both the Government and myself entered into plea

15  negotiations in good faith.  And there was nothing but good

16  faith on behalf of the Government as well as myself and

17  Mr. Tatro hoping to resolve the case short of trial.

18         We reached out to the State and indicated to them

19  that the defendant would probably receive the functional

20  equivalent of a life sentence.  Obviously the Court can't

21  really impose life imprisonment because there's not a

22  statutory maximum of life, but the Court could impose

23  equivalent of life in prison by the number of months that

24  the Court could impose in this case.

25         And the state attorney was unwilling to dismiss or

1    agree to dismiss the State charges if the defendant were to

2    receive the functional equivalent of a life sentence.

3        I think the state attorney was concerned that the

4    defendant not having a life sentence might get out early.

5    And I think Mr. Searle and myself both checked with the

6    proper authorities in the Bureau of Prisons to indicate

7    that the defendant would have to serve 85 percent of any

8    sentence that was imposed as well as if the State were to

9    impose a concurrent sentence to whatever sentence this

10   Court imposes.

11       Because the primary jurisdiction in this case

12   rests with the State, if you were to give Mr. Tatro the

13   functional equivalent of a life sentence and then if he

14   were to go to state court and plea, let's say, to 30 years

15   and the State runs it concurrent, under the BOP regulations

16   he would have to do that 30-year state sentence first.

17       So the only thing that we tried to do all along --

18   and I think we've been upfront with the Court about this --

19   is once the suppression motion was denied was to try to

20   make sure the defendant could serve his time in federal

21   prison because of his numerous medical and physical issues

22   and mental health issues.  And that's all we're trying to

23   do.

24       THE COURT:  Well, let me -- it's a little bit --

25   everything about this case is a little unorthodox.  So I

1    don't have any problem with an unorthodox sentencing

2    proceeding, at least outside of what I usually do.

3            I have been wrestling with this situation myself

4    trying to, trying to figure out what would be a just

5    sentence under the circumstances in light of all of the

6    considerations that you mentioned as well as those that are

7    in the PSR and in the sentencing memorandum.

8            I'd like to get some input from you and from

9    Mr. Searle.  Because I met with the probation office

10   earlier today to see whether or not it was possible for me

11   to impose a life sentence as opposed to what you're calling

12   the functional equivalent of life.

13           It is my intent -- I don't think it's a surprise

14   to anyone -- to sentence Mr. Tatro to essentially a life

15   sentence as a result of the offense for reasons that I'll

16   go into in more detail later on.

17           But I do appreciate the jurisdictional conflict

18   with respect to the pending charges in state court.  It's

19   my understanding that since he was arrested on the State

20   charges initially, that they would have jurisdiction unless

21   they'd relinquish it.

22           And whatever their hesitancy is to relinquish it,

23   obviously in my judgment Mr. Tatro would be better served

24   in the custody of the Bureau of Prisons for a lot of

25   reasons, not the least of which would be the availability

1    of facilities like Butner or Lexington if his medical

2    situation is more compelling than the need for a

3    segregation based on the charges as well as the

4    availability of psychosexual counseling.

5           But Mr. Tatro, in my judgment, even though he has

6    many mitigating circumstances in his own life history, his

7    intellectual capacity, his own abuse, that when you

8    consider the severity, the magnitude, the horrific nature

9    of this offense, and the Court's judgment that nothing can

10   be done to protect the public save lifetime incarceration

11   of Mr. Tatro, that's what I intend to do.

12          I would like to try to do it in a way that at

13   least gives Mr. Tatro the best possible opportunity to find

14   himself housed in a federal facility.

15          When I spoke with the Bureau of Prisons this

16   morning, I was actually trying to see if there was some

17   special incantation I could make during the course of the

18   sentencing process that would help that.  They were not

19   encouraging about it.

20          So when I talked with Miss Correa this morning,

21   the probation office, at least, seemed to think initially

22   that I could sentence him to life.  If you and Mr. Searle

23   think otherwise, why don't we talk about that.

24          And then I'll get sort of back on script and make

25   sure that I do all of the appropriate, make all the

 1   appropriate findings with respect to moving forward with

 2   the sentencing proceeding.  But I'd be interested in

 3   getting input from you.

 4        And I see Miss Kindel is here from probation as

 5   well.  She may have some thoughts on the subject.

 6        MR. SKUTHAN:  Well, I think, in essence, the

 7   statutory maximum for all of the production cases is

 8   30 years in prison.  So if the Court ran all of those

 9   consecutive, that would be 270 years in prison.

10        And the statutory maximum for the three receipt

11   counts and one possession count is 20 years in prison.  If

12   those were run consecutively, that would be 350 years in

13   prison or as probation pointed out 4200 months.

14        Unfortunately -- as a defense attorney I shouldn't

15   say that; but since this is unorthodox, if you want to give

16   him life, you can't give him life.

17        THE COURT:  So life would be an unlawful sentence

18   because it's in excess of the statutory maximum for any one

19   of the offenses?

20        MR. SKUTHAN:  That's correct.

21        THE COURT:  That is what I thought initially.

22        MR. SKUTHAN:  It would have to be a statutory

23   maximum on each count.  And if that would run consecutive

24   -- which, again, this is not an argument I've ever made

25   before.  I don't like making it.  But I think you

1    understand the situation.

2          That, to me, at least, that would be the

3    functional equivalent of life.

4          The second thing I think that's important to point

5    out, we spoke to the Bureau of Prisons last week, and they

6    were very helpful.

7          They said a third option is if the State of

8    Florida were to R&R Mr. Tatro.  And then that way he would

9    be picked up on the writ.

10         THE COURT:  They mentioned that to me this morning

11   as well, the fellow that I spoke to, that he could be

12   bonded.

13         MR. SKUTHAN:  Right.  And then that way -- and I

14   fully understand why the State of Florida would not want to

15   commit ahead of time.  But I think -- I'm hoping that once

16   the sentence is imposed, they see, unfortunately, what the

17   sentence is, that the time and effort to prosecute him

18   would pale in comparison to what he needs for his medical

19   and psychiatric needs as well as his physical needs.

20         And I would point out that since we're kind of

21   talking about acceptance of responsibility, you know, we

22   did a two-and-a-half-hour bench trial.  I mean, that was

23   short.  We didn't have a jury trial which would have tied

24   up resources for a whole week.  And we did that because we

25   were trying to work the case out and we wanted to try to do

```
 1    everything we can to work it out, and we couldn't.  So we
 2    couldn't plea.
 3            So that was the next way to do it where it doesn't
 4    impact his State case as far as using any sort of admission
 5    of guilt in the State case while at the same time hoping
 6    that they will not pursue the charges there.
 7            The only other thing I would ask the Court to do
 8    -- and I know we're trying to put the cart before the
 9    horse.  But one thing I think the Court could do is,
10    whatever sentence you impose, is not file the judgment for
11    let's say a period of 14 days.  And then that would give us
12    time to go to the State.
13            Because if you file the judgment, the marshals,
14    obviously they have a warrant from Brevard County, a
15    detainer.  They're going to send him right over to Brevard.
16            And I think 14 days would give us a period of time
17    to at least hopefully work something out.
18            THE COURT:  Well, I also alerted the marshals in
19    advance.  Obviously, I didn't indicate what my sentence
20    would be because I hadn't reached a conclusion about it.
21    But I did express my interest in the marshal system to try
22    to maintain, try to facilitate Mr. Tatro's delivery to the
23    Bureau of Prisons recognizing that the state court
24    jurisdiction is a complicating factor.
25            So the marshal service, at least, is already aware
```

```
 1    of Mr. Tatro's circumstances.  And I think to the extent

 2    they can lawfully cooperate, they will lawfully cooperate.

 3              MR. SKUTHAN:  Yes, sir.

 4              THE COURT:  Let me get back with the probation.

 5              Miss Correa, Miss Kindel, do you all concur?  I

 6    know that when we just met earlier, you were under the

 7    impression that perhaps a life sentence would be

 8    appropriate.

 9              Have you rethought that position?

10              PROBATION OFFICER:  Your Honor, I stand corrected.

11    Mr. Skuthan is correct in that matter.

12              THE COURT:  Okay.  All right.  Anything else that

13    the defense wants to bring to my attention by way of

14    objections to the computation of the guidelines or

15    objections to the facts?

16              MR. SKUTHAN:  No, Your Honor.

17              THE COURT:  All right.  How about from the

18    Government's position, Mr. Searle?

19              MR. SEARLE:  No, Your Honor.

20              THE COURT:  All right.  I'm going to note the

21    objection from the defense as to the factual statements

22    contained in the PSR, and I'm going to recognize that those

23    objections are being made for purposes of preserving the

24    right to dispute them in the State charges.

25              But for purposes of sentencing, I'm going to adopt
```

1    the facts contained in the PSR and the computation of the

2    guidelines contained in the presentence report and note

3    that that results in a total offense level of 43 as a

4    result of the fact that 43 is the highest offense level.

5    Otherwise, it would be in excess of that.

6          Criminal history category I, a resultant guideline

7    range of imprisonment of 4,200 months or 350 years,

8    guideline term of supervised release ranging from a minimum

9    of 5 years to a maximum of life.

10         Restitution, we're going to need to defer the

11   restitution.  Is that right, Mr. Searle?

12         MR. SEARLE:  Yes, Your Honor.

13         THE COURT:  All right.  We're going to have a

14   deferred hearing on the restitution issue.

15         Fine ranging from $25,000 to $250,000.  And a

16   special assessment in the amount of $1,300.

17         I have victim impact statements which we'll get to

18   at the time of the restitution hearing.  But are there any

19   other victims that the Government is aware of that would

20   like to make a presentation prior to the imposition of

21   sentence?

22         MR. SEARLE:  No, Your Honor.

23         THE COURT:  Is the Government aware of any legal

24   bar or impediment to proceeding with the imposition of

25   sentence?

```
 1              MR. SEARLE:  No, Your Honor.

 2              THE COURT:  And how about the defense,

 3    Mr. Skuthan?

 4              MR. SKUTHAN:  No, Your Honor.

 5              THE COURT:  All right.  Mr. Skuthan, is there

 6    anything that you'd like to add?  Would you like to be

 7    heard on the issue of sentencing before I ask Mr. Tatro if

 8    he wants to make an allocution?

 9              MR. SKUTHAN:  I thought the Government had a

10    presentation, Your Honor.

11              THE COURT:  Oh, I'm sorry.  I'll ask Mr. Searle

12    whether the Government wants to make a presentation.

13              I've had an opportunity to review your sentencing

14    memorandum.  And I appreciate the Government's position

15    that you would like a guideline sentence of 4,200 months;

16    is that right?

17              MR. SEARLE:  Yes, Your Honor.

18              THE COURT:  I didn't want to -- I got off track

19    because this is what happens when you change the routine,

20    if you change the routine.  I want to make sure we don't

21    leave anything out.

22              But let me give the Government an opportunity to

23    make its case as to an appropriate sentence.

24              MR. SEARLE:  Your Honor, as I indicated in the

25    sentencing memorandum, the Government believes that a
```

1    guideline sentence is appropriate here.

2         This is obviously accomplished not by a life

3    sentence but by imposing a sentence that's the equivalent

4    to life by sentencing the defendant to the maximum per each

5    count and running those sentences consecutive.

6         We believe that all of the sentencing factors at

7    18 U.S.C. 3553(a) weigh in favor of such a sentence.  This

8    was among the most violent and horrific offenses that we've

9    seen in this courthouse.

10        As the Court is aware, the Court has had the

11   opportunity to hear the evidence at the bench trial and

12   actually see the images.

13        The defendant repeatedly sexually abused his own

14   3-year-old child, including anally raping the child,

15   forcing the child to perform oral sex on him, and perform

16   oral sex on the child.

17        The defendant not only abused the child but

18   produced child pornography images and videos of this abuse

19   and then further victimized the child by putting those

20   images and videos into the illegal stream of commerce for

21   other pedophiles to see thereby essentially continuing the

22   victimization of this child forever.

23        In addition to victimizing his own child, the

24   defendant received numerous photographs and videos of child

25   pornography depicting other children.  The defendant also

1    possessed a large cache of child pornography, specifically

2    443 photos and 62 videos on two cell phones and

3    1,110 images on his Google account.

4         The child pornography collection depicted children

5    as young as infants, including acts of bondage, masochistic

6    and sadomasochistic conduct, as well as bestiality.

7         There's also evidence on the record, Your Honor,

8    that the defendant sought out other children to abuse.

9    Specifically, when the defendant's cell phones were

10   forensically examined, law enforcement saw that he was

11   conducting online research of an 8-year-old child that law

12   enforcement ultimately identified and confirmed the

13   defendant knew.

14        Specifically, the mother of the child confirmed

15   that she was acquaintances with the defendant's girlfriend

16   and that on one occasion the defendant actually asked the

17   mother of the child if he could baby-sit the child.

18        Beyond that, Your Honor, in evidence at the bench

19   trial was trial -- Government's Exhibit 15 which was a Kik

20   Messenger application chat printout that specifically

21   showed chats the defendant had with another Kik user.

22        In those chats, the defendant discussed sexually

23   abusing a child he believed was in the custody of the other

24   Kik user, including anally raping that child.

25        Moreover, Your Honor, in those communications, the

 1  defendant advised the other Kik user not to view child

 2  pornography on a laptop computer because law enforcement

 3  had the ability to identify that.

 4          This demonstrates the defendant knew his conduct

 5  was illegal, and he knew that this was something that law

 6  enforcement was looking for, which is all to demonstrate

 7  that the defendant is an extreme danger to children and had

 8  no respect for the law during the entire period that he was

 9  committing these offenses and that he specifically must be

10  deterred by a guideline sentence.

11          The defendant was also deliberately evasive to law

12  enforcement.  If the Court recalls during the bench trial,

13  the defendant was interviewed by law enforcement, and there

14  were a number of categories where he was evasive and

15  deliberately dishonest.

16          Specifically, he attempted to distance himself

17  from the Google account that he used to upload the child

18  pornography which the National Center for Missing &

19  Exploited Children discovered.  And that was what started

20  this whole investigation.

21          He claimed initially that the Google account that

22  he used was hacked.  He then claimed that he had turned one

23  of his cell phones and the SIM card into the service

24  provider.

25          And he ultimately claimed once the child

1 pornography was discovered on his devices that he only

2 abused the child on two specific occasions in 2014.

3   Of course, the forensic examination revealed that

4 he abused the child on numerous occasions in 2014

5 continuing into 2015.

6   All of this demonstrates as far as the Government

7 is concerned that the defendant was far more calculating

8 and aware than he presents himself to be here at the

9 sentencing.

10   From a general deterrence standpoint, a guideline

11 sentence is also appropriate because the Court must send a

12 strong message to others in the community who would

13 sexually abuse or exploit children that there will be

14 severe consequences for doing so.

15   And, unfortunately, we see these cases far too

16 often in this courthouse.  And a sentence in the guidelines

17 range would send a message and hopefully deter someone from

18 engaging in this kind of conduct.

19   The Court noted that there is some substantial

20 mitigation in the defendant's history and characteristics.

21 As the Government has indicated in their sentencing

22 memorandum, we believe that the aggravating nature of the

23 defendant's offense far outweighs any mitigation.

24   It's also important to look at some of that

25 mitigation in the context of the minor victim in this case.

1    Because the defendant does suffer from microcephaly, but so

2    does the minor victim who he abused.

3         The defendant was a victim of sexual abuse.  But

4    he chose to continue that vicious cycle by sexually abusing

5    the minor victim.

6         This minor victim is among the most vulnerable

7    victims that we have in federal cases.  And, unfortunately,

8    the child is going to live with the scars of this abuse for

9    the rest of his life.

10        I was prepared to play for the Court the forensic

11   interview of the child.  However, I'll just summarize what

12   the Court would see if that had been played for the Court.

13        In the interview, the child is able to disclose

14   that the child had been sexually abused by the defendant,

15   specifically referring to his anus and essentially telling

16   the interviewer that his father had sexually abused him at

17   that location.

18        This was a 4-year-old child with developmental

19   issues that was able to communicate that, which speaks to

20   the scarring that this child endured, that a child in that

21   situation would be able to communicate that to someone who

22   was interviewing them.

23        And tragically, we are already seeing the effects

24   of that abuse on the child.  As I indicated in my

25   sentencing memorandum, after the bench trial in October of

```
1    this year, the Brevard County Sheriff's Office received a

2    complaint from an elementary school indicating that the

3    minor victim is already acting out sexually at school.  So

4    we're already seeing the consequences of the defendant's

5    offense play out in that child.

6          This is a tragedy.  And the fact that the

7    defendant did this to his own child who he is responsible

8    for and who he was supposed to care and love is among the

9    most disturbing things that I've seen in my time as a

10   criminal prosecutor.

11         We believe that in federal court and we -- in

12   federal prison and we concur with the Court that that is

13   probably the appropriate place for this defendant to spend

14   the rest of his life.

15         He can receive adequate medical care and treatment

16   specifically at the Butner facility or at a similarly

17   situated Bureau of Prisons facility.

18         In terms of any kind of disparity here, I don't

19   think that that's going to be an issue for the Court.  But

20   as I cited in my memorandum, there have been sentences of

21   individuals who have engaged in less egregious conduct

22   where they've received life, specifically the United States

23   versus Marshall case, which I've cited at page 8 in my

24   sentencing memorandum.

25         That was a case where the defendant sexually
```

```
 1   abused his own daughter for a period of time.  The daughter
 2   was between the ages of 14 and 17 during the time of the
 3   abuse.
 4           And more recently in a case that wasn't cited in
 5   the memorandum, United States versus Michael Glenn
 6   Glascock, which is Case Number 6:14-cr-34-ORL-28DAB.  The
 7   sentencing took place in February of 2015.  And in that
 8   case, Judge Antoon sentenced the defendant to life.
 9           It was a strikingly similar offense to this one in
10   that the defendant in that case sexually abused his
11   3-year-old daughter and produced images of the abuse which
12   were then distributed via the internet.
13           That victim also had speech delays and was
14   developmentally delayed.  And in that case, Judge Antoon
15   sentenced the defendant to life.
16           There was another charge in that case that allowed
17   for a life sentence.  So in that sense, it isn't exactly
18   the same issue that the Court is dealing with here.
19           But ultimately based on everything, the
20   United States concurs with the Court's initial remarks that
21   the defendant must spend the rest of his life in federal
22   prison, unfortunately, given the horrific nature of this
23   offense.
24           THE COURT:  Thank you, Mr. Searle.
25           Now, Mr. Skuthan, is there anything you'd like to
```

```
 1   add to your prior, our prior discussion with respect to
 2   sentencing?
 3              MR. SKUTHAN:  I'll be brief.
 4        Your Honor, I would like to call a short witness
 5   to testify, Miss Brianna Geary from our office.
 6        THE COURT:  Miss Geary, would you come forward and
 7   be sworn, please, ma'am.
 8        Right here is fine.  Please raise your right hand.
 9   Miss Flick will place you under oath.
10        (Witness sworn.)
11        THE WITNESS:  I do.
12        THE DEPUTY CLERK:  Please take the witness stand.
13                    DIRECT EXAMINATION
14   BY MR. SKUTHAN:
15   Q    Miss Geary, how are you employed?
16   A    I'm an investigator with the federal public defender's
17   office.
18        THE COURT:  Let's get the spelling of her last
19   name for Miss First, please.
20        THE WITNESS:  It's G-E-A-R-Y.
21        THE COURT:  Thank you.  You may inquire.
22   BY MR. SKUTHAN:
23   Q    How long have you been so employed?
24   A    With the federal public defender's office, about a
25   year and a half.
```

1   Q    And what is your educational background?

2   A    I have a bachelor's and master's degree in social

3   work.  And I am a licensed clinical social worker.

4   Q    And were you assigned to this case by me to work on

5   the mitigation?

6   A    I was.

7   Q    And as part of that assignment, did you gather records

8   that were made part of the sealed exhibit in this case?

9   A    Yes, extensive records.

10  Q    So which records, without going into the specific

11  detail as to what's in the records, what records did you

12  obtain?

13  A    I got educational records from Brevard County schools,

14  Circle -- or psychiatric records from Circles of Care,

15  records from Department of Children and Families, the

16  Michigan State Police Department.

17      Medical records from the jail and from Central Florida

18  Regional Hospital.  And then I got reports from the Bureau

19  of Prisons as well as experts that were hired.

20  Q    And did you do a background investigation into

21  Mr. Tatro's parents, Miss Virginia Tatro and Roger Tatro?

22  A    I did.

23  Q    And did you interview a woman named Miss Ecker in this

24  case?

25  A    I did, yes.

```
1    Q    And just if you could tell us briefly who Miss Ecker
2    is?
3    A    Miss Ecker is, refers to herself as Joshua's
4    godmother.  And Joshua refers to her as Mom.
5    Q    And how, how long has Miss Ecker known Joshua Tatro?
6    A    She met him, she knew his mother when he was -- before
7    he was born.  But then she came back in contact with his
8    family when Joshua was in high school.
9    Q    And did there come a time where she took Joshua and
10   his brother in?
11   A    Yes.
12   Q    And approximately how old was Joshua Tatro at that
13   point?
14   A    It was later in high school, about his junior, senior
15   year of high school.
16   Q    Okay.  And why did Miss Ecker take custody of Joshua
17   Tatro?
18   A    Because when she got back in contact with the family,
19   she realized that his mother was abusing drugs.  And when
20   she talked to the mother, she said, I want you to get help,
21   and I'll take the boys.
22   Q    Okay.  So this wasn't done through the court system or
23   through DCF.  It was just an arrangement that was seen as
24   something better for Joshua?
25   A    That's what it appears to be, yeah.
```

1  Q    Okay.  And could you describe for me how Miss Ecker

2  described Miss Virginia Tatro?

3  A    She said that Miss Tatro had a very child-like

4  personality.  She herself was very impaired.  She had a

5  strong addiction to drugs, and she put those drugs before

6  her children many times.

7       She cited one occasion where her son Joshua was

8  eating, and it was the only food they had in the house.

9  And she took the food right out of his hand and said that

10  she was hungry, and it was more important for her to eat

11  than for her children to eat.

12  Q    And was she a drug addict?

13  A    Yes.

14  Q    Okay.  And during your investigation in this case, did

15  you obtain two letters, character letters for Mr. Tatro?

16  A    I did.

17  Q    And one was from Miss Ecker?

18  A    It was.

19  Q    And did you ask her if she could come to the

20  sentencing today?

21  A    I did.

22  Q    And what did she say?

23  A    She was unable to be here.  Transportation, money

24  issues.

25  Q    And did you obtain another letter from a Christiane

```
 1   Tatro?

 2   A     I did.

 3   Q     And can you tell us who that is?

 4   A     That is Joshua's paternal grandmother.

 5   Q     And you've spoken with her?

 6   A     I have.

 7   Q     And then the letter that was submitted to the Court,

 8   you asked her to write a letter.  And that's the letter

 9   that she wrote?

10   A     That's correct.

11         MR. SKUTHAN:  I have no further questions,

12   Your Honor.

13         THE COURT:  Does the Government have any

14   cross-examination?

15         MR. SEARLE:  No, Your Honor.

16         THE COURT:  All right.  Thank you, ma'am.  You can

17   step down.

18         MR. SKUTHAN:  Your Honor, I'll be brief, like I

19   said.  And I'm not going to try to regurgitate everything

20   in the sentencing memorandum and what's in the sealed

21   documents.

22         I think Miss Geary did an excellent job doing an

23   index to the documents to paint the picture of Mr. Tatro,

24   the way he was raised.

25         Both his parents were disabled, significantly so.
```

1    When the social worker in Brevard County met with the

2    parents when Joshua was 5 years old, they had -- the social

3    worker had difficulty talking to the parents because of

4    their developmental disability.

5         The dad was arrested for domestic violence three

6    times by the time Joshua Tatro was 5 years old.  The mother

7    had been arrested for several different offenses, mostly

8    misdemeanors.  She attempted suicide twice before he turned

9    6 years old, and she was a drug addict for most of her

10   life.

11        He was diagnosed with microcephaly, which gathers

12   a lot of attention these days because of the Zika virus,

13   but there's other ways that it can be caused.  And one of

14   the ways is by the parent having drug or alcohol abuse,

15   which his mother did.

16        And some of the things that happen when you have

17   microcephaly, in addition to the small head that is the

18   physical aspect of it, is you can have developmental delays

19   such as problems with speech, which he had; intellectual

20   disability, which he has; feeding problems, which he's had;

21   and vision problems, which he has.  So it's clear the

22   microcephaly played a significant role in his physical

23   limitations.

24        When he was three -- and then later the Brevard

25   County schools labeled him as educatable mentally

 1   handicapped.  And they found that his vocabulary, his

 2   comprehension, his verbal concept formation, his visual

 3   analysis, his auditory recall, his nonverbal problem

 4   solving, and his organizational skills fell significantly

 5   below his chronological age.

 6          So one can say I think safely that he was quite

 7   damaged.

 8          And I think with all of those factors, it would

 9   have been difficult even for parents that were responsible

10   and had means to deal with a child of this nature, to have

11   to deal with it.  But they were not equipped to handle it.

12          I think in looking through the records, one can

13   see that his mother loved him but had just horrible,

14   horrible parenting skills and horrible, horrible addiction

15   problems.

16          There was a lengthy discussion of all of the times

17   DCF went out to the house.  I'm not going to dwell on that.

18   I would just talk about two instances in particular.

19          One was when he was 6 years old.  The neighbors

20   complained that he and his brother were playing in the pond

21   where there were alligators and water moccasins; that they

22   had burned down their previous trailer at the ages of 5 and

23   7; that their father was acting aggressively towards them;

24   and that they were not being treated or handled properly by

25   the parents.

1          DCF had many investigations.  And the last

2     investigation they had before Mr. Tatro turned 10 years

3     old, they closed the investigation because he was moving to

4     Michigan.

5          But when he got to Michigan, his mother left him

6     in the care of a person named Richard Sweitzer who was a

7     convicted sex offender in Brevard County.  He moved up to

8     Michigan.

9          Mr. Sweitzer, in such a unique twist of something

10    I can't explain, ended up marrying Mrs. Tatro's mother,

11    even though there was evidence that he had sexually abused

12    Joshua Tatro in Brevard County.

13         While in Michigan, Mrs. Tatro went back to Florida

14    for a few months, and Mr. Sweitzer sexually abused Joshua

15    Tatro as well as another minor.  And he subsequently was

16    convicted and sent to prison for 25 to 50 years.  And he's

17    serving time in Michigan right now.

18         Ironically, as a defense, after he got that

19    lengthy sentence, he had his lawyer file a motion

20    indicating that although the sexual abuse had occurred on

21    Joshua Tatro, it occurred in Brevard County and not in

22    Michigan and he wanted to withdraw his plea.  So by his

23    very admission, he indicated that he had abused Joshua

24    Tatro in Brevard County.

25         After that happened and his mother knew that it

 1   had happened, he came back to Florida, and they started

 2   counseling at Circles of Care.  And this happened for about

 3   a whole year between the ages of 12 and 13.

 4        And the first thing Circles of Care wanted to know

 5   if he had ever been sexually abused, and the mother denied

 6   it to Circles of Care.  There could have been an

 7   intervention at that time had she been honest about it, and

 8   he could have got perhaps the treatment he needed.

 9        Over the next year, he received counseling

10   services.  He received medication.  He was diagnosed as

11   ADHD.  He was diagnosed with ODD.  He was diagnosed with

12   mental retardation.  And his last IQ score was a 56.

13        On July 16th of that year, the mother

14   complained that Joshua, who at that point was 12 years old,

15   was putting poop on the floor.  And the next month when she

16   went to visit, they considered it a good visit.  And the

17   reason why they considered it a good visit is because

18   Joshua, at 12 years old, was no longer putting poop on the

19   floor.

20        So that gives you an idea of what they think is a

21   good visit for Joshua, that he's no longer at 12 years old

22   putting poop on the floor.

23        At that time, he's 88 pounds.  And they put him on

24   medication.  And he's stayed on medication until

25   January 31st of 2006.  And at that point, the mother

1    indicated that she thought Joshua needed a medication

2    holiday.  Everyone agreed.  And Circles of Care never saw

3    him again.

4         The next time they did see him was four and a half

5    year later.  He was Baker Acted in March of 2010 for -- the

6    allegation was that he was making threats to people at the

7    school.  He was given medication.  He was released.

8         And then two months later he was Baker Acted

9    again.  This time the allegation was he asked a friend for

10   a gun so the friend could either shoot Joshua or so Joshua

11   could shoot himself.

12        So he was suicidal.  And it's not, it's not

13   unexpected given the situation he was in.

14        He did receive a degree, a special education

15   degree from Brevard County school system.

16        And then when he was arrested in this case -- he

17   always had digestive issues.  His father had a colostomy

18   bag.  His father died of sepsis because his situation was

19   not treated.

20        And Mr. Tatro had an obstruction during the time

21   he was in the Seminole County Jail and also in BOP for a

22   psych evaluation.  They couldn't figure out what it was.

23   They kept giving him laxatives until finally they found it

24   was an obstruction.

25        And he was very sick.  And they performed a

1    colonoscopy.  So he wears a colostomy bag, which makes him

2    very vulnerable while he's in prison.

3              After the bench trial in this case, Mr. Tatro

4    tried to hurt himself again, this time by stabbing himself

5    with a pen.  When he was put in the van to be taken to the

6    hospital, he was banging his head against the inside of the

7    van.  And the records are replete with conduct where he in

8    the past had banged his head against the wall.

9              Clearly, there's no good facts in this case.

10             I think one of the most telling things -- this is

11   the only document that I'll read from.  It's very short.

12   Regarding Joshua Tatro.

13             The person is -- he's been in jail now for a year

14   and a half.  He hasn't had a single visitor.  He has a

15   grandmother who's in good health in her 70s.  She's never

16   visited him.  Miss Ecker has never visited him.  He has no

17   visitors.

18             He wrote out a complaint saying he was depressed.

19   And it's written in child-like language.  But it says, I

20   feel very depressed, sad, lonely.  Feel like everyone hates

21   me, is making fun of me behind my back.  I feel like no one

22   loves me, like unimportant and lost and confused.

23             And he asked to see the psychiatrist.  And it was

24   soon after that that he tried to hurt himself again.

25             So I said I would be short and hopefully I have

```
 1    been.  I just think I need to highlight some of the

 2    factors.  It's always easier in hindsight to blame DCF for

 3    his problems; but I really think more could have been done,

 4    especially after everyone seemed to know that he was

 5    sexually abused.

 6           And later when he was in high school and was Baker

 7    Acted twice, that should have sent a message to somebody

 8    that this is a very damaged young man.

 9           The Government rightfully on behalf of their

10    client has asked for the Court to recognize the Booker

11    factors of protection of the public and providing just

12    punishment.  And I understand that.

13           We're asking the Court to use the history and

14    characteristics of Mr. Tatro and find a way to impose a

15    sentence where he will do -- whatever time he does he will

16    do it in federal prison.

17           If nothing else, he should be safe and his medical

18    issues and the psychiatric issues should be addressed.  And

19    I think that can be done in the Bureau of Prisons.

20           I think if the Court were to look at the BOP

21    competency report, he did well when he was there at BOP.

22    And I think they can handle that situation much better than

23    the State can.

24           So I'd ask that the Court impose a reasonable

25    sentence in this case and do everything within this Court's
```

```
1    power to make sure that his sentence is served in a federal
2    institution.
3         THE COURT:  Thank you, Mr. Skuthan.
4         Mr. Tatro, is there anything you'd like to say to
5    me before I proceed to impose sentence?
6         MR. SKUTHAN:  Your Honor, based on the pending
7    State case, I've advised him that he shouldn't make a
8    statement.  But I don't know if the Court wanted to address
9    that with him or not.
10        THE COURT:  Okay.  Mr. Tatro, the only thing I
11   wanted to do is make sure that you understand that you have
12   a right to make a statement.  I understand your lawyers are
13   recommending that you not do that because of the fact that
14   you have pending State charges.
15        I want to be respectful of that.  I don't want to
16   put you in a position where I'm exposing you to any kind of
17   additional jeopardy in light of the State charges, but I do
18   want to make sure that you understand that you have a right
19   to make a statement to me if you want to do that.
20        THE DEFENDANT:  (Nods head.)
21        THE COURT:  So you need to let me know how you'd
22   like to proceed.  You either want to make a statement, or
23   do you want to stand on your lawyer's arguments and have me
24   proceed to sentence you without making any statement?
25        THE DEFENDANT:  I don't want to make any
```

```
 1   statement.

 2          THE COURT:  Okay.  All right.  Thank you, sir.

 3          Well, I began the proceedings, as I mentioned,

 4   in somewhat of an unorthodox way because this is a very

 5   unorthodox case.

 6          I'm going to make some findings with respect to

 7   what the Court's taken into account in terms of fashioning

 8   Mr. Tatro's sentence, recognizing the obligation that the

 9   Court has to individualize Mr. Tatro's sentence and to

10   impose a sentence that is sufficient but not greater than

11   necessary to achieve the statutory purposes of sentencing.

12          And taking into account, first of all, the

13   horrific nature of the crime.  It's hard to describe the

14   crime in sufficiently graphic terms to capture how serious

15   it is.

16          The breach of the responsibility of a parent to

17   safeguard their child conducting -- Mr. Tatro subjecting

18   his own child to repeated violent, painful, and certainly

19   physically and emotionally scarring sexual abuse that

20   undoubtedly will inflict a lifetime of punishment on his

21   own son.

22          It's hard for the Court to get, frankly, its mind

23   around the consequences of that kind of conduct and the

24   level of depravity in an individual that is manifested by

25   the commission of that type of a criminal offense.
```

1          So certainly the sentence that is imposed needs to

2    be sufficiently severe that it takes that factor into

3    consideration.

4          I've also had an opportunity to review in great

5    detail the information about the facts and circumstances of

6    Mr. Tatro's life up to the time of the commission of the

7    offense.  And it would also be fair to categorize the

8    mitigating circumstances in the category of some of the

9    most compelling that the Court has ever seen.

10         Mr. Tatro himself was -- not only is he suffering

11   from diminished intellectual capacity, which is not an

12   excuse for his offense, but he was raised in a, frankly, an

13   environment that, again, defies description almost.

14         The lack of parents who either had the ability or

15   the intellectual capacity to provide him with the care and

16   treatment that he required.  The fact that he was subjected

17   to sexual abuse himself.  The fact that even after that

18   sexual abuse, he did not receive care and treatment for it

19   is probably -- certainly in hindsight, it's no great

20   surprise, I guess, that we find ourselves here today, as

21   shocking as it is.

22         So when I look at the options that are available

23   to the Court and I evaluate the other 3553 factors,

24   certainly the sentence has to, as the Government points

25   out, be sufficiently lengthy that it serves as a deterrent.

```
 1    I don't think that's going to be a problem.
 2            I think the problem becomes how to fashion a
 3    sentence that is respectful of the Court's responsibility
 4    to impose a sentence that is sufficient but not greater
 5    than necessary to achieve the statutory purposes of
 6    sentencing.
 7            It's hard, quite honestly, to imagine that a
 8    sentence of 4,200 months, which is 350 years, is anything
 9    short of vengeful.  As I said at the outset, it's certainly
10    my responsibility, I think, to protect the public from the
11    very great likelihood of a future commission of an offense.
12            And under no circumstances do I think Mr. Tatro
13    should have any opportunity to serve a single day outside
14    of confinement in the custody of the Bureau of Prisons.
15            So confinement for the rest of his natural life in
16    the custody of the Bureau of Prisons would seem to me to be
17    an appropriate sentence.  I don't have that option
18    available to me because to impose a life sentence would be
19    unlawful.
20            So how do I impose a proper sentence that is not
21    -- if I impose a sentence of 350 years, I have to make sure
22    that that's not for what would be unjust or unlawful
23    purposes, which would be vindictiveness or vengefulness.
24    Certainly the crime warrants a very harsh sentence, and a
25    life sentence is a very harsh sentence.
```

1           But I then focus on what are Mr. Tatro's needs

2    based on what I see in the materials before me.  And

3    certainly he has a need for intensive medical care and

4    treatment, both for his physical ailments as well as for

5    his -- the clear psychosexual and mental problems he has

6    coupled with the fact that he's of diminished intellectual

7    capacity.

8           And so I need to fashion a sentence that's going

9    to provide him with a correctional treatment in the most

10   effective manner as envisioned by 3553.

11          Because of this unusual circumstance of having the

12   competing State charges, what I hope to do is impose a

13   sentence that in the context of all of the 3553 factors

14   allows Mr. Tatro to have the best possible opportunity to

15   get the educational, psychosexual training, medical care,

16   and correctional treatment that he needs in the custody of

17   the Bureau of Prisons.  So that's the reason that I'm going

18   to impose the sentence that I'm going to impose.

19          I am going to sentence Mr. Tatro to a guideline

20   sentence of 350 years or 4,200 months.  And I'm going to

21   impose that sentence consecutively on any sentence that he

22   may receive in the State program.

23          The reason that I am imposing that sentence and

24   not reducing it is because even though the functional

25   equivalent of life can be achieved by a sentence that's

```
 1    significantly shorter -- obviously, what's the difference
 2    in terms of the functional equivalence of life in a
 3    sentence of, let's say, 100 years, 1,200 months versus
 4    350 years, 4,200 months?
 5            Well, the difference is that if I evaluate 3553
 6    and I try to impose a sentence that's going to provide him
 7    with the best possible chance of getting into the Bureau of
 8    Prisons, I think I need to do whatever I can to make sure
 9    that the State of Florida is comfortable that Mr. Tatro is
10    going to serve a sentence of life in the custody of the
11    Bureau of Prisons.
12            I'm going to impose it consecutively because I
13    think it will give, then, the State the opportunity if they
14    decide to proceed with State charges to impose some small
15    or low sentence on Mr. Tatro, recognizing that his
16    consecutive State sentence would then come into play.
17            And, of course, the federal government would then
18    have the obligation to incur the, not insignificant by any
19    measure, costs of maintaining Mr. Tatro, both his medical
20    care and his care and treatment for his clearly documented
21    psychosexual disorder and dysfunction.  It's going to be
22    significant.
23            Perhaps, Mr. Skuthan, that will be an argument
24    that would be able to be made at the time of his, at the
25    dealing with his State -- with your counterparts in the
```

1   State system.

2          So were it not for that, in the judgment of the

3   Court, a sentence of 4,200 months would be far excessive,

4   far in excess of what's necessary to achieve a sentence

5   that's sufficient but not greater than necessary and would

6   be vindicative or vengeful.

7          But I think under the circumstances, for the

8   reasons that I've articulated, that's a just sentence.  And

9   it's a sentence that comports with the State, the

10  Government's -- I mean, the Court's obligation, as the

11  Government pointed out, to provide protection for the

12  public, which would require lifetime incarceration for

13  Mr. Tatro, and yet still at least attempt to address the

14  other 3553 factors of the nature and circumstances of the

15  individual defendant and the need to provide a correctional

16  treatment in the most effective manner.

17         So, Mr. Tatro, if you and Mr. Skuthan would stand,

18  I'll proceed with the imposition of sentence.

19         MR. SKUTHAN:  Your Honor?

20         THE COURT:  Yes, sir.

21         MR. SKUTHAN:  Before the Court imposes sentence,

22  can I address one issue before you impose sentence?

23         THE COURT:  Yes.

24         MR. SKUTHAN:  Whatever sentence you impose, if the

25  State decides to prosecute, he's going to go there first.

1    And even if they impose a concurrent sentence, that

2    sentence will be served first.

3              THE COURT:  I understand that.

4              MR. SKUTHAN:  So it's my understanding that even

5    if they impose a concurrent sentence, BOP is not going to

6    recognize the concurrency of that sentence so --

7              THE COURT:  I apologize for interrupting you, but

8    I don't think it's a question of recognizing.  I think it's

9    a jurisdictional question that BOP -- unless the State

10   relinquishes jurisdiction of Mr. Tatro either by electing

11   to prosecute him or releasing him on bond or R&R or

12   otherwise affirmatively delivering him over to the Bureau

13   of Prisons and relinquishing jurisdiction, I don't think it

14   makes a difference.

15             So anyway, let me let you finish your thought.  I

16   apologize for interrupting you.

17             MR. SKUTHAN:  No.  My only thought was to not

18   oppose it consecutively.  Obviously, I'm not trying to

19   re-litigate a decision the Court has already made.

20             THE COURT:  Well, if you think that I'm wrong --

21   the purpose of my consecutive sentence was to at least

22   create the opportunity for the State to impose a smaller

23   sentence than life.  I don't know that they'd be inclined

24   to do that.

25             But in my judgment, every day that Mr. Tatro could

```
 1    spend in the custody of the Bureau of Prisons would be a

 2    benefit.  And so a concurrent sentence will mean just that,

 3    that unless the State completely relinquishes jurisdiction

 4    of Mr. Tatro, he'll serve all of his time in the Department

 5    of Corrections.

 6            So that was the rationale.  If you don't want me

 7    to do that, then I'm happy to impose a concurrent sentence.

 8            Because my goal is to -- I'm trying to fashion a

 9    sentence that gives Mr. Tatro every opportunity to serve

10    his life sentence or the functional equivalent of life in

11    the custody of the Bureau of Prisons.

12            So I'm certainly open to changing my mind about

13    that if you think it's in -- if you think it's more likely

14    to achieve that outcome.

15            MR. SKUTHAN:  I think it would.

16            THE COURT:  Okay.

17            MR. SKUTHAN:  Thank you.

18            THE COURT:  You're welcome.

19            All right.  Mr. Tatro, now, if you would stand

20    with your counsel, please.

21            Do you have a view on that one way or the other,

22    Mr. Searle?  I don't want to leave the Government out of

23    the discussion.

24            MR. SEARLE:  Your Honor, everything that

25    Mr. Skuthan has represented to the Court in terms of how
```

1    BOP will treat this is accurate as far as my understanding

2    with, from conferring with BOP on this very issue as well,

3    not only this case but in other cases.

4          So I think the ultimate issue is, as the Court

5    stated, they have to relinquish custody in order for him to

6    be brought into BOP custody first.

7          So I don't think it matters whether it's

8    consecutive or concurrent.  So we'll just have to see what

9    they ultimately decide to do here after the sentencing.

10          THE COURT:  What about, does the Government have a

11    view on the Court withholding the entry of the written

12    judgment for some period of time to give Mr. Skuthan or

13    Mr. Tatro's lawyers in state court an opportunity to

14    explore the situation with the authorities at the state

15    level?

16          MR. SEARLE:  I have no issue with that,

17    Your Honor.  The Government believes that federal prison is

18    the best place for Mr. Tatro.  So whatever the Court deems

19    appropriate in order to at least attempt to accomplish

20    that, the Government would stand behind it.

21          THE COURT:  All right.  And I guess, Mr. Skuthan,

22    that technically I could continue to keep Mr. Tatro in

23    federal custody pursuant to the writ until the judgment is

24    entered at which time he'd be delivered back to the -- the

25    writ would then be extinguished and he would be delivered

```
 1    back to the custody of the state authorities.
 2            MR. SKUTHAN:  That's correct.  Once the judgment
 3    and the SOR are filed, then I think they can bring him
 4    over.  But until that's done --
 5            THE COURT:  Okay.
 6            MR. SKUTHAN:  And hopefully your conversations
 7    with the marshal will accomplish that as well.  It's not as
 8    though we're asking for several months.  I think 14 days is
 9    an appropriate period of time.
10            THE COURT:  All right.  Mr. Tatro, the Court has
11    inquired as to whether there's any legal reason not to
12    proceed with the imposition of sentence, and having heard
13    none, having heard the arguments of counsel, reviewed the
14    extensive submissions filed by your lawyer on your behalf,
15    having reviewed the sentencing memorandum submitted by the
16    United States as well as the defense sentencing memorandum,
17    having reviewed carefully the provisions of Title 18 of the
18    United States Code, Section 3551 and 3553, it's the
19    judgment of the Court that the defendant, Joshua Adam
20    Tatro, be committed to the custody of the Bureau of Prisons
21    to be imprisoned for a term of 4,200 months or 350 years.
22            This term consists of terms of 360 months on each
23    of counts 1 through 9 and terms of 250 (sic) months on each
24    of counts 10 through 13, all such terms to run consecutive,
25    one to the other.
```

```
 1           If you are released from imprisonment, you shall

 2   serve a lifetime term of supervised release as to each and

 3   all counts 1 through 13.  Those terms are to run

 4   concurrently.

 5           While you're on supervised release, should that

 6   occur, you're ordered to comply with the standard

 7   conditions adopted by the Middle District of Florida as

 8   well as the following special conditions:

 9           Participation in a mental health program that

10   specializes in sexual offender treatment.

11           You're to submit to polygraph testing for

12   treatment and monitoring purposes and to follow the

13   probation office's instructions as well as to bear your

14   proportionate responsibility for payment.

15           You're ordered to register with the state sexual

16   offender registration agencies in any state where you

17   reside, visit, are employed, carry on a vocation, or are

18   engaged as a student as may be directed by the probation

19   officer.

20           The probation office will provide state officials

21   with all the information that's required under the Florida

22   sexual predator and sexual offender notification and

23   registration statutes.  And you may be directed to report

24   to these agencies personally for additional processing,

25   such as photographing, fingerprinting, and DNA collection.
```

1          You're ordered to have no direct contact with

2    minors under the age of 18 without the written approval of

3    the probation office.

4          And you're ordered to refrain from entering into

5    any area where children frequently congregate, including

6    schools, day care centers, theme parks, playgrounds,

7    et cetera.

8          You are prohibited from possessing, subscribing

9    to, or viewing any images, videos, magazines, literature,

10   or other materials that depict children in the nude or in,

11   and/or in sexually explicit positions.

12         Without the written approval in advance of the

13   probation office, you are prohibited from either possessing

14   or using any computer, smartphone, handheld computer

15   device, gaming console, or electronic device that's capable

16   of connecting to an online service or an internet service

17   provider.

18         This prohibition includes a computer in a public

19   library, internet cafe, your place of employment, or an

20   educational facility.

21         You're also prohibited from possessing any

22   electronic data storage mediums.  That includes a flash

23   drive, compact disc, floppy disk, or from using any data

24   encryption software programs or techniques.

25         Should you be approved to possess or use any such

1   device, you must permit routine inspection, including

2   inspection of the hard drive and any electronic data

3   storage medium to confirm that you're in compliance with

4   this condition.  The probation office must conduct this

5   inspection in a manner that's no more intrusive than

6   necessary to ensure that you're in compliance.

7            Should this condition affect a third party, it

8   would be your obligation to inform the third party of the

9   restriction, including the computer inspection provision.

10           You're ordered to submit to a search of your

11  person, residence, place of business, any storage unit

12  under your control, computer, or vehicle to be conducted by

13  the United States Probation Office at a reasonable time and

14  in a reasonable manner based on any reasonable suspicion of

15  contraband or evidence of a violation of a condition of

16  your release.

17           You shall inform any other residents that the

18  premises may be subjected to a search pursuant to this

19  condition.  Failure to submit to a search may be grounds

20  for revocation.

21           You are prohibited from incurring any credit card

22  charges, opening additional lines of credit, or obligating

23  yourself for any major purchases without the approval of

24  the probation office.

25           You're ordered to provide the probation office

1    with any requested financial information, and you're

2    ordered to cooperate in the collection of DNA as directed

3    by the probation officer.

4         The mandatory drug testing requirements of the

5    Violent Crime Control Act are imposed.

6         I'm going to defer the issue of restitution for a

7    period not to exceed 90 days.  And that hearing will be set

8    on separate notice.

9         Pursuant to Title 18 of the United States Code,

10   Section 3664 sub (d)(5), the final determination of the

11   victim's losses will be entered under separate order.

12        I'm going to waive the imposition of a fine based

13   on the defendant's financial circumstances.

14        Are there any forfeiture issues that the

15   Government is aware of, Mr. Searle?

16        MR. SEARLE:  Yes, Your Honor.  The Government

17   would ask that the forfeiture of the electronic devices

18   identified in document 107 be incorporated into the final

19   judgment entered.

20        THE COURT:  All right.  We'll incorporate the

21   forfeiture issues that are set forth in doc number 107

22   entered on October the 21st, 2016, as part of the Court's

23   final judgment.

24        I've considered all the advisory sentencing

25   guidelines and all the factors identified in Title 18 of

```
 1   the United States Code, Section 3553(a)(1) through (7) in

 2   the sentence.

 3           In the judgment of the Court, the sentence imposed

 4   is sufficient but not greater than necessary to comply with

 5   the statutory purposes of sentencing for the reasons that

 6   were previously expressed in the record.

 7           To the extent that it impacts the decision of my

 8   counterparts at the state court, it's the intent of -- it's

 9   my intent that the sentence imposed here be imposed

10   concurrently to any sentence that might be imposed in the

11   state proceedings.

12           I don't have that case number handy.  Do you have

13   it, Mr. Skuthan?

14           MR. SKUTHAN:  I do.

15           It's in a paragraph of the PSR, paragraph 85.

16           THE COURT:  All right.

17           MR. SKUTHAN:  Which is 15-CF-019441A.

18           And that's the 18th Judicial Circuit, State of

19   Florida.

20           THE COURT:  All right.  It's the intent, it's my

21   intent that the sentence imposed today be imposed

22   concurrently with the sentence that will be subsequently

23   imposed in the state court proceedings.

24           Also recognizing completely the authority that the

25   state officer has to deal with his or her matter in a way
```

1    that -- I want to make sure that nothing I say suggests

2    that I don't recognize the obligation -- to give every

3    confidence in the state court to impose a sentence that's

4    just.

5          But I want to make sure that this transcript

6    reflects that, in my view, the lifetime sentence or the

7    equivalent of a life sentence that Mr. Tatro has received

8    here could best be accomplished if it were served in the

9    custody of the Bureau of Prisons.

10          And that the -- not only is it a fair disposition

11   under the circumstances, but the cost of providing the

12   medical care and attention to Mr. Tatro as well as the cost

13   of attending to his significant psychosexual needs and the

14   availability of federal facilities that are well designed

15   to meet that objective would warrant consideration to the

16   State of relinquishing jurisdiction over Mr. Tatro and

17   delivering him to the custody of the Bureau of Prisons,

18   recognizing that they will exercise their own independent

19   judgment in making that determination.  And I don't wish in

20   any way to tread on that, just to express my view.

21          The defendant is remanded to the custody of the

22   United States Marshal to await designation by the Bureau of

23   Prisons.

24          It's my responsibility, Mr. Tatro, to advise you

25   that you have the right to appeal the sentence of the

```
 1  Court.  If you fail to appeal the sentence within 14 days
 2  of today's date or the day the judgment is reduced to
 3  writing, that may constitute a waiver of your right to
 4  appeal.
 5          The Government may take an appeal.
 6          And if you cannot afford a lawyer, one will be
 7  provided for you because you are entitled to the assistance
 8  of counsel.
 9          And if you cannot afford the filing fee, the Clerk
10  of the Court will be directed to accept the notice of
11  appeal without the payment of the fee.
12          Mr. Skuthan will continue to represent you until
13  he's relieved by an order of the Court of Appeals if you
14  undertake to engage the appellate process.
15          The Court having pronounced its sentence, does
16  either counsel for the Government or counsel for the
17  defense have any objection to the Court's factual findings,
18  the sentence, or the manner in which it was imposed?
19          Let me hear from Miss Kindel first.  I may have
20  omitted something in my sentence.
21          PROBATION OFFICER:  I just wanted to make sure --
22  I might have misheard.  But I thought you said 250 months
23  as to counts 10 through 13.
24          THE COURT:  I meant to say 240 months.  Right?
25          PROBATION OFFICER:  240.  I just wanted to make
```

```
 1   sure.

 2          THE COURT:  Yes.  If I said 250, I meant 240.  So

 3   I'll direct -- I'll correct the record if I said 250.  I

 4   meant to say 240.

 5          PROBATION OFFICER:  Thank you.

 6          THE COURT:  Yes.

 7          Any objection to the factual findings, the

 8   sentence, or the manner in which the sentence was imposed

 9   by the United States?

10          MR. SEARLE:  No, Your Honor.

11          THE COURT:  From the defense?

12          MR. SKUTHAN:  Other than those previously made,

13   no, no objection.

14          THE COURT:  All right.  Thank you.

15          I am going to ask my courtroom deputy to take her

16   time in preparing the written final judgment.  I expect I

17   probably won't be able to get to that for about 14 days.

18   So to the extent that you can have some success with your

19   counterparts at state court while that document is being

20   prepared, I wish you and Mr. Tatro well in that regard.

21          MR. SKUTHAN:  Your Honor, if I could ask if the

22   Court could recommend Butner, the federal correctional

23   institution of Butner, North Carolina.

24          THE COURT:  I will include a recommendation that

25   he be housed at Butner or the equivalent of Butner,
```

 1   recognizing not only his psychosexual needs but also his

 2   medical needs.

 3           I have -- and I do want to recite this for the

 4   record.  I meant to do it.  I have, I have concerns.  I

 5   started to say grave concerns.  Not to be trite about it.

 6   There aren't any other kind.

 7           But I have concerns about Mr. Tatro's well-being,

 8   not only in terms of security from himself but also

 9   security from the inmate population.

10           Again, I say that not in disparagement of the

11   ability of the State Department of Corrections folks to

12   provide safe and secure housing and care and treatment for

13   Mr. Tatro, but only because I am more familiar with the

14   facilities that are available at the Bureau of Prisons and

15   I have at least a higher level of confidence that

16   Mr. Tatro's safety, security, and well-being will be better

17   served by housing at the Bureau of Prisons.  So --

18           MR. SKUTHAN:  We have one other request,

19   Your Honor.

20           THE COURT:  Yes.

21           MR. SKUTHAN:  If the Court is aware, we did not

22   cooperate with the PSR interview process because of the

23   pending charges.  But we did submit to the Court, as the

24   Court is aware, sealed documents.

25           And we would ask the ability to supplement the PSR

1  with that information just so when BOP gets the PSR,

2  they'll have that information.

3          THE COURT:  Do you want to continue that

4  information be maintained under seal for transmission to

5  the Bureau of Prisons?

6          MR. SKUTHAN:  Yes, Your Honor.

7          THE COURT:  Does the Government have a position on

8  that, Mr. Searle?

9          MR. SEARLE:  We have no objection, Your Honor.

10          THE COURT:  Miss Kindel, Miss Correa, what would

11  be the procedure?  Is there any way to have sealed portions

12  of the PSR?

13          What I'm a little bit concerned about, quite

14  honestly, is while I know that in theory the PSR is not

15  available to anybody that's not authorized, I also know

16  that in practice that's not always the case.

17          So I'm concerned about incorporating the

18  information which I do think would be invaluable to the

19  Bureau of Prisons in making a determination about

20  appropriate housing.

21          I'm also concerned about it finding its way into

22  the hands of people who don't have Mr. Tatro's best

23  interest at heart.

24          PROBATION OFFICER:  I was going to suggest that

25  you attach it to the PSR so that it could be filed.  So

```
 1    that's how we would get it to them.

 2            I don't know of any other way to get it to them

 3    other than as attached to the PSR because that's not public

 4    record.

 5            THE COURT:  But the PSR, there's no super-sealing,

 6    right?  If I make it part of the PSR, it becomes a part of

 7    the PSR that's subject to seal just like the rest of it.

 8            PROBATION OFFICER:  Yes.

 9            THE COURT:  Okay.

10            PROBATION OFFICER:  But if you order it attached,

11    we will file a new copy of the PSR with all of those

12    documents attached, and it will all go to BOP.  That's why

13    it couldn't be filed in the public.

14            MR. SKUTHAN:  And we can get with probation to

15    best accomplish that.

16            THE COURT:  Okay.  All right.  I'm happy to do

17    that then.

18            In the absence of any objection by the Government,

19    I do think it would be useful information for BOP.  I'll

20    permit the defense to supplement the PSR with the materials

21    that were previously provided to the Court under seal.

22            Anything further from the United States,

23    Mr. Searle?

24            MR. SEARLE:  No, Your Honor.  Thank you.

25            THE COURT:  Anything further from the defense?
```

1          MR. SKUTHAN:  No, Your Honor.  Thank you.

2          THE COURT:  Thank you.  I'll take a brief recess

3    and come back for my 2:30.

4          (Proceedings adjourned at 2:47 p.m.)

5                          * * * * *

6

7                   C E R T I F I C A T E

8

9          I certify that the foregoing is a correct

10   transcript from the record of proceedings in the

11   above-entitled matter.

12

13   1/13/17

14   s\Amie R. First, RDR, CRR, CRC, CPE

15

16

17

18                        **INDEX**

19   **DEFENDANT WITNESSES**

20                           D I R E C T   C R O S S   R E D I R E C T   R E C R O S S

21   BRIANNA GEARY                    22

22

23

24

25